# OFFSHORE LOGISTICS, INC., ET AL. *v.* TALLENTIRE ET AL.

No. 85–202.   Argued February 24, 1986—Decided June 23, 1986

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and REHNQUIST, JJ., joined, and in Part III of which BRENNAN, MARSHALL, POWELL, and STEVENS, JJ., joined. POWELL, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 233.

*Keith A. Jones* argued the cause for petitioners. With him on the briefs were *J. B. Ruhl* and *Howard Daigle, Jr.*

*Charles Hanemann* argued the cause for respondents. With him on the brief was *V. Farley Sonnier.**

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Geller, Deputy Assistant Attorney General Willmore,* and *Thomas L. Jones;* and for Sonat Offshore Drilling, Inc., et al. by *E. D. Vickery* and *Gus A. Schill, Jr.*

Briefs of *amici curiae* urging affirmance were filed for the Association of Trial Lawyers of America by *James A. George* and *Peter Perlman;* and for Domengeaux & Wright by *William Rutledge.*

Briefs of *amici curiae* were filed for the Louisiana Trial Lawyers Association by *Drew Ranier;* for the Texas Trial Lawyers Association by *Robert A. Chaffin;* and for Kenneth G. Engerrand, *pro se.*

JUSTICE O'CONNOR delivered the opinion of the Court.

Respondents' husbands were killed when petitioner Air Logistic's helicopter, in which the decedents were traveling, crashed into the high seas. The issue presented is whether the Death on the High Seas Act (DOHSA), 41 Stat. 537, 46 U. S. C. § 761 *et seq.*, provides the exclusive remedy by which respondents may recover against petitioner for the wrongful death of their husbands, or whether they may also recover the measure of damages provided by the Louisiana wrongful death statute, La. Civ. Code Ann., Art. 2315 (West Supp. 1986), applying either of its own force or as surrogate federal law under the Outer Continental Shelf Lands Act (OCSLA), 67 Stat. 462, as amended, 43 U. S. C. § 1331 *et seq.*

I

The husbands of respondents Corrine Taylor and Beth Tallentire worked on drilling platforms in the Gulf of Mexico, off the coast of Louisiana. On August 6, 1980, respondents' husbands were killed while being transported in a helicopter owned and operated by petitioner Air Logistics (hereafter petitioner), a Division of Offshore Logistics, Inc., from a drilling platform to Houma, Louisiana. The crash occurred approximately 35 miles off the coast of Louisiana, well over the 3-mile limit that separates Louisiana's territorial waters from the high seas for purposes of DOHSA.

Respondents each filed wrongful death suits in United States District Court, raising claims under DOHSA, OCSLA, and the law of Louisiana. These actions were later consolidated in the Eastern District of Louisiana. Upon petitioner's pretrial motion for partial summary judgment, the District Court ruled that DOHSA provides the exclusive remedy for death on the high seas, and it therefore dismissed respondents' claims based upon the Louisiana wrongful death statute. Petitioner admitted liability and the trial was limited to the question of damages. Because DOHSA limits recovery to "fair and just compensation for . . . pecuniary loss,"

the District Court's awards to respondents did not include damages for nonpecuniary losses. 46 U. S. C. § 762.

Respondents appealed the District Court's dismissal of their OCSLA and state law wrongful death claims, contending that they were entitled to nonpecuniary damages under the Louisiana wrongful death statute. See La. Civ. Code Ann., Art. 2315(B) (West Supp. 1986) (permitting recovery for both pecuniary and nonpecuniary damages, "includ[ing] loss of consortium, service, and society"). They argued that the Louisiana statute applied to this helicopter crash on the high seas, either of its own force by virtue of the saving provision in § 7 of DOHSA, 46 U. S. C. § 767, or as adopted federal law through OCSLA. See 43 U. S. C. § 1333(a)(2)(A). The Court of Appeals for the Fifth Circuit reversed the District Court's denial of benefits recoverable under Lousiana law, with one judge specially concurring and another judge dissenting. See 754 F. 2d 1274 (1985).

The Court of Appeals first observed that even if OCSLA did apply to this action, OCSLA adopts state law as surrogate federal law only "[t]o the extent [the state laws] are . . . not inconsistent with . . . other Federal laws." 43 U. S. C. § 1333(a)(2)(A). Because the precedent of the Fifth Circuit held that DOHSA applies to a helicopter crash on the high seas, the court concluded that Louisiana law could not be applied through OCSLA as the Louisiana wrongful death scheme was inconsistent with DOHSA. Accordingly, the court turned to the question whether state law could apply of its own force by virtue of § 7 of DOHSA, which provides:

> "The provisions of any State statute giving or regulating rights of action or remedies for death shall not be affected by this chapter. Nor shall this chapter apply to the Great Lakes or to any waters within the territorial limits of any State, or to any navigable waters in the Panama Canal Zone." 46 U. S. C. § 767.

After examining the legislative history of § 7, the Court of Appeals concluded that that section was intended to preserve

the applicability of state wrongful death statutes on the high seas. It further held that Louisiana had legislative jurisdiction to extend its wrongful death statute to remedy deaths on the high seas and that Louisiana in fact intended its statute to have that effect. In reaching its result, the court acknowledged that the disunity that its decision would create was "profoundly unsettling," 754 F. 2d, at 1284, but ultimately concluded that "[o]ur desire for a uniform, consistent, scheme of maritime death remedies cannot justify a refusal to follow" the perceived legislative will. *Id.*, at 1288.

Judge Jolly filed a special concurrence, observing that although the court's result was compelled by § 7, it would create "significant problems in the field of maritime law because it defies reason, runs contrary to principles of the general precedent in the field, and creates all sorts of internal inconsistencies in the prosecution of cases dealing with death on the high seas." *Id.*, at 1289. Judge Garza dissented, arguing that § 7 was intended to preserve state wrongful death actions only in territorial waters and echoing the view of the Court of Appeals for the Ninth Circuit that the application of state law to wrongful death actions arising on the high seas would be "'as damaging to uniformity in wrongful death actions as it is illogical.'" *Ibid.* (quoting *Nygaard* v. *Peter Pan Seafoods, Inc.*, 701 F. 2d 77, 80 (CA9 1983)).

Because the Fifth Circuit's decision creates the potential for disunity in the administration of wrongful death remedies for causes of action arising from accidents on the high seas and is in conflict with the prevailing view in other courts that DOHSA pre-empts state law wrongful death statutes in the area of its operation, we granted certiorari. 474 U. S. 816 (1985). We now hold that neither OCSLA nor DOHSA requires or permits the application of Louisiana law in this case, and accordingly reverse the judgment of the Court of Appeals for the Fifth Circuit.

## II

The tortuous development of the law of wrongful death in the maritime context illustrates the truth of Justice Cardozo's observation that "[d]eath is a composer of strife by the general law of the sea as it was for many centuries by the common law of the land." *Cortes* v. *Baltimore Insular Line, Inc.,* 287 U. S. 367, 371 (1932). In *The Harrisburg,* 119 U. S. 199 (1886), this Court held that in the absence of an applicable state or federal statute, general federal maritime law did not afford a wrongful death cause of action to the survivors of individuals killed on the high seas, or waters navigable from the sea. It reasoned that because the common law did not recognize a civil action for injury which resulted in death on the land, no different rule should apply with respect to maritime deaths. Unable to tolerate this archaism, some courts began to allow recovery for deaths within state territorial waters if an applicable state statute permitted such recovery. See, *e. .g., The City of Norwalk,* 55 F. 98, 103–108 (SDNY 1893) (state wrongful death statute may validly be applied to "maritime affairs within the state limits"), aff'd, 61 F. 364, 367–368 (CA2 1894) (application of state wrongful death statute to accident in state territorial waters valid "in the absence of any regulation of the subject by congress"). See also *Steamboat Co.* v. *Chase,* 16 Wall. 522 (1873).

In an attempt to alleviate the harshness of the rule of *The Harrisburg,* this Court also recognized in *The Hamilton,* 207 U. S. 398 (1907), that state wrongful death statutes could, in some limited circumstances, be applied to fatal accidents occurring on the high seas. In *The Hamilton,* the Court held that where the statutes of the United States enabled the owner of a vessel to transfer its liability to a fund and to claim the exclusive jurisdiction of admiralty, and where that fund was being distributed, a Delaware citizen's claim under Delaware law against another citizen of Delaware for wrongful death on the high seas would be recognized in admiralty. The Court noted that "[i]n such circumstances all claims to

which the admiralty does not deny existence must be recognized whether admiralty liens or not." *Id.*, at 406.

*The Hamilton* has sometimes been understood to endorse a broader application of state law on the high seas than its holding suggested. Some courts came to rely on dicta in *The Hamilton* for the "questionable" proposition that if a state wrongful death statute was intended to extend to torts occurring on the high seas, then an action between citizens of that State for a wrongful death on the high seas could lie in admiralty. Day, Maritime Wrongful Death and Survival Recovery: The Need for Legislative Reform, 64 Colum. L. Rev. 648, 650 (1964). See also *Wilson* v. *Transocean Airlines*, 121 F. Supp. 85, 88 (ND Cal. 1954); Comment, 51 Calif. L. Rev. 389 (1963) ("Because the constitutionality of the application of a state wrongful death statute to occurrences on the high seas was doubtful, the cases [recognizing such an application] had to rest on farfetched theories"); Putnam, The Remedy for Death at Sea, 22 Case & Com. 125, 126–127 (1915). There was continued doubt, in spite of *The Hamilton*'s dicta, as to the States' competence to provide wrongful death relief for causes of action arising on the high seas. See *Moragne* v. *States Marine Lines, Inc.*, 398 U. S. 375, 393, n. 10 (1970) ("The general understanding was that the statutes of the coastal States, which provided remedies for deaths within territorial waters, did not apply beyond state boundaries"); H. R. Rep. No. 674, 66th Cong., 2d Sess., 2, 4 (1920) (accompanying DOHSA) ("there is no right of action for death under" maritime law; "the right to affirmative action [outside of limitation of liability actions] in the admiralty against ship or owner has never been sustained by the Supreme Court").

Even where *The Hamilton* was understood to sanction a state remedy for the high seas, "probably because most state death statutes were not meant to have application to the high seas, [the] possibility [of recovery under state law for deaths on the high seas] did little to fill the vacuum" left by *The Har-*

*risburg. Moragne* v. *States Marine Lines, supra,* at 393, n. 10. Moreover, those state wrongful death statutes that were held to apply to the high seas had limited effectiveness because, under the dicta in *The Hamilton,* "[l]egislative jurisdiction to impose a liability for a wrongful act at sea beyond the boundaries of the state had to rest upon one of two theories: either (1) that the vessel upon which the wrongful act occurred was constructively part of the territory of the state; or (2) that the wrongdoer was a vessel or citizen of the state subject to its jurisdiction even when beyond its territorial limits. Neither theory sufficed for every situation." *Wilson* v. *Transocean Airlines, supra,* at 88. Such conflict of laws problems arose out of collisions between vessels incorporated in different States and between American-flag vessels and those flying the flag of a foreign jurisdiction that in one celebrated case the perplexed court simply denied recovery entirely. See, *e. g., The Middlesex,* 253 F. 142 (Mass. 1916) (where collision on high seas was between two American vessels whose owners resided or were incorporated in different States, recovery could not be had under any of the potentially applicable state statutes). See also Day, *supra,* at 650–651, and n. 13; Robinson, Wrongful Death in Admiralty and the Conflict of Laws, 36 Colum. L. Rev. 406 (1936). In sum, for all practical purposes, from the date of *The Harrisburg* until the passage of DOHSA in 1920, "there was no remedy for death on the high seas caused by breach of one of the duties imposed by federal maritime law." *Moragne* v. *States Marine Lines, Inc.,* 398 U. S., at 393.

It was in this atmosphere that Congress considered legislation designed to provide a uniform and effective wrongful death remedy for survivors of persons killed on the high seas. See *id.,* at 398, 401; *Wilson* v. *Transocean Airlines, supra,* at 88–90. In 1920, Congress enacted DOHSA, in which it finally repudiated the rule of *The Harrisburg* for maritime deaths occurring beyond state territorial waters by providing for a federal maritime remedy for wrongful deaths more than

three miles from shore.[1]   DOHSA limits the class of beneficiaries to the decedent's "wife, husband, parent, child, or dependent relative," 46 U. S. C. § 761, establishes a 3-year statute of limitations period, § 763a, allows a suit filed by the victim to continue as a wrongful death action if the victim dies of his injuries while suit is pending, § 765, provides that contributory negligence will not bar recovery, § 766, and declares that "recovery . . . shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought. . . . " § 762.

As this Court explained in *Mobil Oil Corp.* v. *Higginbotham,* 436 U. S. 618, 621–622 (1978):

> "In the half century between 1920 and 1970, deaths on the high seas gave rise to federal suits under DOHSA, while those in territorial waters were largely governed by state wrongful-death statutes, [the primary exception being survivor's suits for wrongful death under the Jones Act, which gives a remedy no matter where the wrong takes place.]   DOHSA brought a measure of uniformity and predictability to the law on the high seas, but in territorial waters, where *The Harrisburg* made state law the only source of a wrongful-death remedy, the continuing impact of that decision produced uncertainty and incongruity.   The reasoning of *The Harrisburg,* which was dubious at best in 1886, became less and less satisfactory as the years passed.
>
> "In 1970, therefore, the Court overruled *The Harrisburg.*   In *Moragne* v. *States Marine Lines, Inc.,* 398

---

[1] DOHSA does not include a survival provision authorizing recovery for pain and suffering before death.   We do not address the issue whether the DOHSA recovery for the beneficiaries' pecuniary loss may be "supplemented" by a recovery for the decedent's pain and suffering before death under the survival provision of some conceivably applicable state statute that is intended to apply on the high seas.   See generally *Barbe* v. *Drummond,* 507 F. 2d 794, 797–798 (CA1 1974); *Dugas* v. *National Aircraft Corp.,* 438 F. 2d 1386 (CA3 1971).

U. S. 375, the Court held that a federal remedy for wrongful death does exist under general maritime law. The case concerned a death in Florida's territorial waters. The defendant argued that Congress, by limiting DOHSA to the high seas, had evidenced an intent to preclude federal judicial remedies in territorial waters. The Court concluded, however, that the reason Congress confined DOHSA to the high seas was to prevent the Act from abrogating, by its own force, the state remedies then available in state waters. *Id.*, at 400." (Footnotes omitted.)

Subsequently, the Court confronted some of the various subsidiary questions concerning the *Moragne* federal death remedy in *Sea-Land Services, Inc.* v. *Gaudet,* 414 U. S. 573 (1974), in which it was held that awards in a *Moragne*-based suit could include compensation for loss of support and services, for funeral expenses, and for loss of society, but not for mental anguish. Finally, in *Higginbotham,* the Court ruled that the nonpecuniary loss standard provided by DOHSA controlled on the high seas, and could not be supplemented by the measure of damages recognized in *Gaudet* for *Moragne* causes of action. In so doing, the Court concluded:

"We realize that, because Congress has never enacted a comprehensive maritime code, admiralty courts have often been called upon to supplement maritime statutes. The Death on the High Seas Act, however, announces Congress' considered judgment on such issues as the beneficiaries, the limitations period, contributory negligence, survival, and damages . . . . The Act does not address every issue of wrongful-death law . . . but when it does speak directly to a question, the courts are not free to 'supplement' Congress' answer so thoroughly that the Act becomes meaningless." 436 U. S., at 625.

With this background, we now proceed to the question at hand: whether the DOHSA measure of recovery may be sup-

plemented by the remedies provided by state law, through either OCSLA or § 7 of DOHSA.

## III

As explained above, DOHSA is intended to provide a maritime remedy for deaths stemming from wrongful acts or omissions "occurring on the high seas." 46 U. S. C. § 761. OCSLA, by contrast, provides an essentially nonmaritime remedy and controls only on "the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures" erected thereon. 43 U. S. C. § 1333(a)(2)(A). By its terms, OCSLA must be "construed in such a manner that the character of the waters above the outer Continental Shelf as high seas . . . shall not be affected." § 1332(2). Within the area covered by OCSLA, federal law controls but the law of the adjacent State is adopted as surrogate federal law to the extent that it is not inconsistent with applicable federal laws or regulations. § 1333(a)(2)(A).

The intent behind OCSLA was to treat the artificial structures covered by the Act as upland islands or as federal enclaves within a landlocked State, and not as vessels, for purposes of defining the applicable law because maritime law was deemed inapposite to these fixed structures. See *Rodrigue* v. *Aetna Casualty & Surety Co.*, 395 U. S. 352, 361–366 (1969). This Court endorsed the congressional assumption that admiralty law generally would not apply to the lands and structures covered by OCSLA in *Rodrigue*, noting that accidents on the artificial islands covered by OCSLA "had no more connection with the ordinary stuff of admiralty than do accidents on piers." *Id.*, at 360. See also *Herb's Welding, Inc.* v. *Gray*, 470 U. S. 414, 422 (1985). Thus, in *Rodrigue*, the Court held that an admiralty action under DOHSA does not apply to accidents "actually occurring" on these artificial islands, and that DOHSA therefore does not preclude the application of state law as adopted federal law through OCSLA to wrongful death actions arising from acci-

dents on offshore platforms. *Rodrigue* v. *Aetna Casualty Co., supra,* at 366.

Respondents argue that because the decedents were platform workers being transported from work to the mainland, OCSLA, not DOHSA, governs their cause of action. They contend that in *Rodrigue* and *Gulf Offshore Co.* v. *Mobil Oil Corp.,* 453 U. S. 473 (1981), the Court recognized the applicability of state law through OCSLA to accidents that resulted in deaths or injuries not on platforms, but on boats in the waters immediately adjacent to the platforms. This, they state, evidences the Court's assumption that OCSLA applies to traditionally maritime locales on the high seas, beyond the confines of the platform, when the decedent is a platform worker. In support of their apparent assumption that it is the decedent's status as a platform worker that controls, they note that it was the "special relationship between the men working on these artificial islands and the adjacent shore to which they commute to visit their families" that moved Congress to treat drilling platforms as upland federal enclaves rather than vessels. *Rodrigue* v. *Aetna Casualty Co.,* 395 U. S., at 365.

We cannot accept respondents' attempt to rewrite OCSLA. The extension of OCSLA far beyond its intended locale to the accident in this case simply cannot be reconciled with either the narrowly circumscribed area defined by the statute or the statutory prescription that the Act not be construed to affect the high seas which cover the Continental Shelf. Nor can the extension of OCSLA to this case be reconciled with the operative assumption underlying the statute: that admiralty jurisdiction generally should not be extended to accidents in areas covered by OCSLA. See, *e. g., id.,* at 361. Here, admiralty jurisdiction is expressly provided under DOHSA because the accidental deaths occurred beyond a marine league from shore. See 46 U. S. C. § 761. Even without this statutory provision, admiralty jurisdiction is appropriately invoked here under traditional principles be-

cause the accident occurred on the high seas and in further-
ance of an activity bearing a significant relationship to a tra-
ditional maritime activity. See *Executive Jet Aviation, Inc.*
v. *City of Cleveland,* 409 U. S. 249 (1972). Although the de-
cedents were killed while riding in a helicopter and not a
more traditional maritime conveyance, that helicopter was
engaged in a function traditionally performed by waterborne
vessels: the ferrying of passengers from an "island," albeit an
artificial one, to the shore. *Id.,* at 271, and n. 20.

The character of the decedents as platform workers who
have a special relationship with the shore community simply
has no special relevance to the resolution of the question of
the application of OCSLA to this case. Neither of the cases
cited by respondents supports their position. *Rodrigue* and
*Gulf Offshore* did not endorse the proposition that it is the
decedent's status or his special relationship with the shore
that required the application of OCSLA, regardless of the lo-
cation of the accident. Indeed, no question was even raised
in *Gulf Offshore* regarding whether OCSLA applied to an ac-
cident aboard a vessel adjacent to the platform. Moreover,
the facts of these cases make clear that OCSLA was pre-
sumed applicable not because of the status of the decedents
but because of the proximity of the workers' accidents to the
platforms and the fact that the fatalities were intimately con-
nected with the decedents' work on the platforms.

We do not interpret § 4 of OCSLA, 43 U. S. C. § 1333, to
require or permit us to extend the coverage of the statute to
the platform workers in this case who were killed miles away
from the platform and on the high seas simply because they
were platform workers. Congress determined that the gen-
eral scope of OCSLA's coverage, like the operation of
DOHSA's remedies, would be determined principally by lo-
cale, not by the status of the individual injured or killed.[2]

---

[2] Only one provision of OCSLA superimposes a status requirement on
the otherwise determinative OCSLA situs requirement; § 1333(b) makes
compensation for the death or injury of an "employee" resulting from cer-

See 43 U. S. C. § 1333(a)(2)(A) ("To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations . . . , the civil and criminal laws of each adjacent State . . . are hereby declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon"); 46 U. S. C. § 761 (DOHSA's coverage extends to the death of any "person . . . caused by wrongful act, neglect, or default occurring on the high seas beyond a maritime league from the shore of any State . . ."). Cf. *Herb's Welding, Inc.* v. *Gray, supra* (discussing status and situs requirements of the Longshoremen's and Harbor Workers' Compensation Act as applied to platform workers making claims against their employers); *Director, Office of Workers' Compensation Programs* v. *Perini North River Associates,* 459 U. S. 297 (1983); 46 U. S. C. § 688 (recovery under Jones Act confined to "seaman"). Because the fatalities underlying this suit did not arise from an accident in the area covered by OCSLA but rather occurred on the high seas, DOHSA plainly was intended to control.

In the circumstances presented, then, the conclusion is inescapable that the remedies afforded by DOHSA, not OCSLA, govern this action. Thus, respondents may secure the nonpecuniary damages made available by Louisiana's wrongful death statute only if it is found that DOHSA preserves, or does not pre-empt, state remedies on the high seas.

### IV

Respondents argue that the first sentence of § 7 of DOHSA was intended to ensure the applicability of state wrongful death statutes to deaths on the high seas. We conclude that that provision will not bear respondents' reading when evalu-

tain operations on the Outer Continental Shelf payable under the Longshoremen's and Harbor Workers' Compensation Act. We note that because this case does not involve a suit by an injured employee against his employer pursuant to § 1333(b), this provision has no bearing on this case.

ated in light of the language of the Act as a whole, the legislative history of § 7, the congressional purposes underlying the Act, and the importance of uniformity of admiralty law. See *Mastro Plastics Corp.* v. *NLRB*, 350 U. S. 270, 285 (1956) ("'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy'") (quoting *United States* v. *Heirs of Boisdoré*, 8 How. 113, 122 (1849)). These references persuade us that the first sentence of § 7 was intended only to serve as a jurisdictional saving clause, ensuring that state courts enjoyed the right to entertain causes of action and provide wrongful death remedies both for accidents arising on territorial waters and, under DOHSA, for accidents occurring more than one marine league from shore.

The first sentence of § 7 of DOHSA, as originally drafted, provided that "the provisions of any State statute giving or regulating rights of action or remedies for death shall not be affected by this act as to causes of action accruing within the territorial limits of any State." See 59 Cong. Rec. 4482 (1920). During the House debate, Representative Mann proposed an amendment deleting the words "as to causes of action accruing within the territorial limits of any state." Although at first blush the language of the amended § 7 seems to support respondents' position, a closer comparison of the language of § 7, both before and after its amendment, with the language of § 4 of the Act belies respondents' facial argument.

The only other amendment made to the bill as originally submitted was the addition of § 4, which provides:

> "Whenever a right of action is granted by the law of any foreign State on account of death by wrongful act, neglect, or default occurring upon the high seas, such right may be maintained in an appropriate action in admiralty in the courts of the United States without abatement in respect to the amount for which recovery is

authorized, any statute of the United States to the contrary notwithstanding." 46 U. S. C. § 764.

Section 4 indicates that when Congress wanted to preserve the right to recover under the law of another sovereign for whatever measure of damages that law might provide, regardless of any inconsistency with the measure of damages provided by DOHSA, it did so expressly. We are reluctant to read the much more ambiguous language of § 7, which states only that state law "remedies" or "rights of action" would not be "affected" and which makes no provision for reconciling potentially conflicting state and federal measures of recovery, to have the same substantive effect as the explicit command of § 4. Normal principles of statutory construction require that we give effect to the subtleties of language that Congress chose to employ, particularly where, as here, Congress isolated only these sections for special consideration by way of amendment while it was considering DOHSA.

The language of § 7 bears a marked similarity to the "saving to suitors" clause that allows litigants to bring *in personam* maritime actions in state courts. See Judiciary Act of 1789, § 9, 1 Stat. 76 ("saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it"); 28 U. S. C. § 1333 (1948 and 1949 amendments to original saving clause) ("saving to suitors in all cases all other remedies to which they are otherwise entitled"). See also *Madruga* v. *Superior Court,* 346 U. S. 556, 560, n. 12 (1954) (1948 and 1949 amendments effected no substantive change). The "saving to suitors" clause leaves state courts competent to adjudicate maritime causes of action in proceedings *in personam* and means that "a state, 'having concurrent jurisdiction, is free to adopt such remedies, and to attach to them such incidents, as it sees fit' so long as it does not attempt to [give *in rem* remedies or] make changes in the 'substantive maritime law.'" *Id.,* at 560–561 (quoting *Red Cross Line* v. *Atlantic Fruit Co.,* 264 U. S. 109, 124 (1924)). Stated another way, the "saving to suitors" clause allows

state courts to entertain *in personam* maritime causes of
action, but in such cases the extent to which state law may
be used to remedy maritime injuries is constrained by a
so-called "reverse-*Erie*" doctrine which requires that the
substantive remedies afforded by the States conform to gov-
erning federal maritime standards. Baxter, Choice of Law
and the Federal System, 16 Stan. L. Rev. 1, 34 (1963) (refer-
ring to *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938)). See
also *Garrett* v. *Moore-McCormack Co.,* 317 U. S. 239, 245
(1942); Stevens, Erie RR. v. Tompkins and the Uniform Gen-
eral Maritime Law, 64 Harv. L. Rev. 246 (1950).

Thus, a natural reading of § 7 is that a state statute provid-
ing a wrongful death right of action traditionally unavailable
at common law would not be "affected" by DOHSA in the
sense of being rendered an incompetent means of invoking
state jurisdiction, but the state statute's substantive provi-
sions would not, by virtue of the saving provision, "extend as
a conduct-governing enactment on the high seas" if in conflict
with DOHSA's provisions. *Safir* v. *Compagnie Generale
Transatlantique,* 241 F. Supp. 501, 508 (EDNY 1965) (inter-
preting § 7). The legislative history of § 7, as originally pro-
posed and as amended, supports this construction of the sec-
tion's language.

The Maritime Law Association (MLA), an organization of
experts in admiralty law and a prime force in the movement
for a federal wrongful death remedy, drafted the bill that was
enacted as DOHSA. The MLA envisioned § 7 to be a juris-
dictional saving clause which completed the statutory scheme
by ensuring continued concurrent state and federal jurisdic-
tion over wrongful death claims arising from accidents on ter-
ritorial waters. See, *e. g.,* American Law Institute, Study
of the Division of Jurisdiction between State and Federal
Courts § 1316(b), pp. 236–237 (1969) (hereinafter ALI Study).
See also Hughes, Death Actions in Admiralty, 31 Yale L. J.
115, 123 (1921). Although congressional proponents viewed
§ 7 as a product of perhaps overabundant caution, the MLA,

an expert body of maritime lawyers, had reason to fear that absent a saving clause specifically recognizing the continued viability of this type of action, state wrongful death remedies on territorial waters might be deemed beyond the competency of state courts. In 1917, this Court handed down *Southern Pacific Co.* v. *Jensen,* 244 U. S. 205, a landmark in admiralty law. In that case the Court held that the remedy a state workmen's compensation statute "attempts to give is of a character wholly unknown to the common law, incapable of enforcement by the ordinary processes of any court and is not saved to suitors from the grant of exclusive jurisdiction" where the rights and liabilities of the parties are clearly matters within admiralty jurisdiction. *Id.,* at 218. The felt necessity for a DOHSA saving clause, then, may be traced to the fact that wrongful death statutes, like workmen's compensation schemes, were not "common law remedies," see *The Harrisburg,* 119 U. S., at 213, and thus may not have been deemed "saved to suitors" under the Judiciary Act of 1789, as construed in *Jensen.*

Although not intended to function as a substantive law saving clause, § 7 incidentally ensured that state courts exercising concurrent jurisdiction could, as under the "saving to suitors" clause, apply such state remedies as were not inconsistent with substantive federal maritime law. It had been recognized that States could "modify" or "supplement" the federal maritime law by providing a wrongful death remedy enforceable in admiralty for accidents on territorial waters. See, *e. g., Western Fuel Co.* v. *Garcia,* 257 U. S. 233 (1921); *Steamboat Co.* v. *Chase,* 16 Wall. 522 (1873). The reach of DOHSA's substantive provisions was explicitly limited to actions arising from accidents on the high seas, see 46 U. S. C. § 761, so as to "prevent the Act from abrogating by its own force, the state remedies then available in state waters." *Mobil Oil Corp.* v. *Higginbotham,* 436 U. S., at 621–622. Thus, because DOHSA by its terms extended only to the high seas and therefore was thought not to displace these

state remedies on territorial waters, see *Moragne* v. *States Marine Lines, Inc.*, 398 U. S. 375 (1970), § 7, as originally proposed, ensured that the Act saved to survivors of those killed on territorial waters the ability to pursue a state wrongful death remedy in state court.

Although the congressional debates on § 7 were exceedingly confused and often ill informed, the remarks of the proponents of the bill amply support the theory that § 7 originally was intended to preserve the state courts' jurisdiction to provide wrongful death remedies under state law for fatalities on territorial waters. In the debate, the discussion focused almost exclusively on the intended jurisdictional effects of that section. See 59 Cong. Rec. 4482–4485 (1920). The proponents of § 7 before its amendment expressed their resolve to save to suitors the benefits of state judicial, and, derivatively, legislative jurisdiction within state territorial waters. See, *e. g.*, *id.*, at 4482 (remarks of Rep. Volstead); *id.*, at 4483 (remarks of Rep. Montague) ("[T]he territorial waters of the States shall be retained within the jurisdiction and sovereignty of the States and their courts"); *ibid.* (remarks of Rep. Montague) (§ 7, as originally drafted, was "put in out of abundant caution, to calm the minds of those who think that rights within the territorial waters will be usurped by the national law"). They also, however, stated their firm intent to make exclusive federal jurisdiction over wrongful death actions arising on the high seas by restricting the scope of § 7 to territorial waters. See, *e. g.*, *ibid.* (remarks of Rep. Moore) ("The purpose . . . is to give exclusive jurisdiction to the admiralty courts where the accident occurs on the high seas"). Thus, they asserted that the effect of § 7, as originally drafted, would be to confer exclusive jurisdiction on the federal admiralty courts for causes of action arising on the high seas. See, *e. g.*, *ibid.* (remarks of Rep. Sanders); *id.*, at 4484 (remarks of Rep. Volstead) ("This bill clearly leaves the jurisdiction exclusive in the Federal court outside the 3-mile limit").

It is against this backdrop that Representative Mann introduced his amendment to § 7. To the extent that Representative Mann's specific intent in introducing his amendment can be deciphered from his contribution to the debate's confusion, his purpose appears at least consistent with the idea that § 7 would serve as a jurisdictional saving clause, as his principal concern seems to have been the recognition of state court jurisdiction over DOHSA claims. Representative Mann had, in debates over an earlier draft of DOHSA, expressed his belief that federal admiralty courts had exclusive jurisdiction over accidents occurring on the high seas. See 51 Cong. Rec. 1928 (1914). In those debates, his principal concern was that state courts would continue to enjoy concurrent jurisdiction with federal admiralty courts over causes of action arising on the Great Lakes. *Ibid.* During the debates on the bill that became DOHSA, Representative Mann continued to express his concern regarding the jurisdiction of state courts over death claims growing out of accidents on territorial waters and the Great Lakes. See, *e. g.*, 59 Cong. Rec. 4483 (1920). However, he also argued in these later debates that if state courts had ever previously exercised jurisdiction over death claims arising on the high seas, they should be permitted to continue to do so. See, *e. g.*, *ibid.* ("Though I do not know, I suppose if a man is injured on the high seas . . . and he can get service on the defendant, as a result of that injury, he can bring suit"); *id.*, at 4484 ("I remember this bill very distinctly in previous Congresses, and . . . I was under the impression that the bill was not intended to take away any jurisdiction which can now be exercised by any State court"); *ibid.* ("If this act as originally drawn by the admiralty lawyers was intended for the purpose of taking away jurisdiction now conferred by State statutes, it ought to be critically examined"). By suggesting the deletion of the language limiting the jurisdictional saving clause's scope only to territorial waters, Representative Mann intended to ensure that state courts could also serve as a forum for the adjudica-

tion of wrongful death actions arising out of accidents on the high seas.  See, *e. g.*, *ibid.* (under Rep. Mann's amendment, where a State gives a cause of action and a death occurred on the high seas, "there would be concurrent jurisdiction"); *id.*, at 4485 (If § 7 were amended as he suggested, "the act will not take away any jurisdiction conferred now by the States").

We conclude that Representative Mann's amendment extended the jurisdictional saving clause to the high seas but in doing so, it did not implicitly sanction the operation of state wrongful death statutes on the high seas in the same manner as the saving clause did in territorial waters.  Under the prevailing "uniformity" doctrine expressed most forcefully in *Southern Pacific Co.* v. *Jensen*, 244 U. S., at 215–216, to the extent Congress provided a federal remedy for wrongful death on the high seas, the federal substantive law would clearly have pre-empted conflicting state wrongful death statutes, as was recognized by various Members during the debates on DOHSA.  See, *e. g.*, 59 Cong. Rec. 4485 (1920) (remarks of Rep. Volstead) ("[T]he power to pass laws on this subject is conferred on Congress in the Constitution, and whenever Congress acts I have no doubt it excludes the power on the part of the State to pass laws on the same subject"); *id.*, at 4486 (remarks of Rep. Goodykoontz).  Admiralty courts would, of course, apply federal maritime law in adjudicating such claims and, as was noted in the congressional debates at the time of DOHSA's passage, state and federal courts exercising jurisdiction under the "saving to suitors" clause over maritime claims for deaths on the high seas were obliged to apply governing federal substantive law in resolving those claims to the extent state common law remedies conflicted with governing federal maritime law. See *Chelentis* v. *Luckenbach S.S. Co.*, 247 U. S. 372, 384 (1918) ("Plainly, . . . under the saving [to suitors] clause a right sanctioned by the maritime law may be enforced through any appropriate remedy recognized at common law; but we find nothing therein which reveals an intention to

give the complaining party an election to determine whether the defendant's liability shall be measured by common-law standards rather than those of the maritime law . . . . [W]ithout regard to the court where he might ask relief, petitioner's rights were those recognized by the law of the sea"); *Southern Pacific Co.* v. *Jensen, supra.* Cf. *Workman* v. *New York City*, 179 U. S. 552 (1900). No reasonable doubt could be entertained of the displacement of state remedies for deaths occurring on the high seas because the conflicting federal standard was not derived just from general federal maritime law; it was explicitly provided for by federal legislation directly on point. See *Southern Pacific Co.* v. *Jensen, supra,* at 216 ("[N]o [state] legislation is valid if it contravenes the essential purpose expressed by an act of Congress"). See also *Garrett* v. *Moore-McCormack Co.*, 317 U. S., at 245; *Pope & Talbot, Inc.* v. *Hawn*, 346 U. S. 406, 411 (1953).

Although Representative Mann's discussion may reflect a broader intent, we believe his references to state court jurisdiction should be read to mean only the ability of state courts to entertain maritime actions based on DOHSA, not the legislative ability to supply a different standard of recovery. As has been explained, even at the time that DOHSA was being considered it was understood that where Congress had spoken, or where general federal maritime law controlled, the States exercising concurrent jurisdiction over maritime matters could not apply conflicting state substantive law. See *Chelentis* v. *Luckenbach S.S. Co., supra; Southern Pacific Co.* v. *Jensen, supra.* See also *Cannon* v. *University of Chicago*, 441 U. S. 677, 696–697 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law"). Indeed, while the reference is somewhat unclear, Representative Mann at least once in the debate seemed to have recognized that, where Congress passed a law, that law would control, exclusively of state law, in the area of its operation. See 59 Cong. Rec. 4484 (1920) (exchange between Reps. Igoe and Mann).

Finally, we note that under the *Jensen* and *Chelentis* cases, there was a fair doubt whether Congress could constitutionally require the application of state statutory remedies to maritime injuries.   Just one year after DOHSA was passed, the Court invalidated a congressional attempt to override the result in *Jensen* by authorizing the application of state workers' compensation statutes to maritime injuries, ruling that Congress could not delegate to the States the ability to prescribe rules governing maritime injuries that "would inevitably destroy the harmony and uniformity which the Constitution not only contemplated but actually established." *Knickerbocker Ice Co.* v. *Stewart*, 253 U. S. 149, 164 (1920).   See *Wilson* v. *Transocean Airlines*, 121 F. Supp., at 90–91.   Given this legal climate and the congressional recognition of that climate, we must infer that if Representative Mann and his colleagues intended affirmatively to require enforcement of state substantive law on the high seas, they would have taken care to make that requirement explicit.   The language of § 7, when read in light of § 4, does not provide an unambiguous guide.   And certainly the debates surrounding § 7's amendment do not indicate with any degree of clarity a congressional intent to save state substantive law on the high seas.   In fact, immediately before the amendment went to a vote, Representative Goodykoontz cautioned that the amendment would simply "leave the [first] sentence [of § 7] incomplete and the remaining language, not unlike Mahomet's coffin, suspended between heaven and earth, having no application to anything in particular."   59 Cong. Rec., at 4486.   The ambiguous language of the proposed amendment went to a vote without clarification, despite Representative Goodykoontz' explicit warning during the final moments of the debate that the amendment would at best be "surplusage" with no meaning, and at worst would destroy the object of § 7 as originally framed because, under the "decisions of the Supreme Court," the incomplete sentence would not be effective to save the state jurisdiction in

territorial waters from being "superseded by the exclusive power and authority of the admiralty courts." *Ibid.*

In sum, we believe that our reading of § 7, while not free from doubt, gives the proper meaning to the language of that section, is supported by its legislative history, and is consistent with the law governing at the time of its passage. It is also in accord with the general congressional purpose behind the enactment of DOHSA. As we have previously recognized, Congress acted in 1920 to remedy "[t]he void that existed in maritime law up until 1920[:] the absence of any remedy for wrongful death on the high seas," and to achieve uniformity in the provision of such a remedy. *Moragne* v. *States Marine Lines, Inc.,* 398 U. S., at 398, 401. See also *supra,* at 214–215. To read § 7 as intended to preserve intact largely nonexistent or ineffective state law remedies for wrongful death on the high seas would, of course, be incongruous. Just as incongruous is the idea that a Congress seeking uniformity in maritime law would intend to allow widely divergent state law wrongful death statutes to be applied on the high seas. See, *e. g.,* Putnam, The Remedy for Death at Sea, 22 Case & Com., at 125–127 (use of state wrongful death statutes "leaves the courts obliged to struggle with state statutes quite divergent in their terms, so that the resulting congeries of modes of remedy on navigable waters show a striking intricacy, leading to marked inefficiency"). See also *Mobil Oil Corp.* v. *Higginbotham,* 436 U. S., at 625 ("Congress did not limit DOHSA beneficiaries to recovery of their pecuniary losses in order to encourage the creation of nonpecuniary supplements," citing as authority *Wilson* v. *Transocean Airlines, supra* (§ 7 does not preserve the operation of state wrongful death statutes on the high seas)). Indeed, it is hardly conceivable that Congress could have intended that these diverse state statutes could be applied to remedy maritime torts occurring the world over. A majority of courts and commentators that have addressed this issue in the 66 years since the passage of DOHSA have

rejected such an illogical interpretation of § 7's intended effect.[3] Many courts and commentators have adopted our construction of § 7 as the only means by which the statutory scheme can be read coherently. See, *e. g.*, *Safir* v. *Compagnie Generale Transatlantique*, 241 F. Supp., at 501; *Ledet* v. *United Aircraft Corp.*, 10 N. Y. 2d 258, 176 N. E. 2d 820 (1961); ALI Study § 1316(b), at 236–237. Cf. *Moragne* v. *States Marine Lines, Inc., supra*, at 400, n. 14 (§ 1 of DOHSA does not place exclusive jurisdiction on the admiralty side of the federal courts for suits under the Act); *Rairigh* v. *Erlbeck*, 488 F. Supp. 865 (Md. 1980).

In sum, the language of § 7 and its legislative history, as well as the congressional purposes underlying DOHSA, man-

---

[3] See, *e. g.*, *Jennings* v. *Goodyear Aircraft Corp.*, 227 F. Supp. 246, 248 (Del. 1964); *Wilson* v. *Transocean Airlines*, 121 F. Supp. 85, 99 (ND Cal. 1954); *Echavarria* v. *Atlantic & Caribbean Steam Nav. Co.*, 10 F. Supp. 677, 678 (EDNY 1935); Robinson, Wrongful Death in Admiralty and the Conflict of Laws, 36 Colum. L. Rev. 406, 410, n. 19 (1936); Magruder & Grout, Wrongful Death within the Admiralty Jurisdiction, 35 Yale L. J. 395, 416, 422–423 (1926). See also, *e. g.*, *Nygaard* v. *Peter Pan Seafoods, Inc.*, 701 F. 2d 77 (CA9 1983) (finding state statutes pre-empted by exclusive DOHSA remedy); *Barbe* v. *Drummond*, 507 F. 2d, at 801, n. 10; *Dugas* v. *National Aircraft Corp.*, 438 F. 2d, at 1388; *Lockwood* v. *Astronautics Flying Club, Inc.*, 437 F. 2d 437, 438 (CA5 1971); *Middleton* v. *Luckenbach S.S. Co.*, 70 F. 2d 326, 329 (CA2 1934); G. Gilmore & C. Black, Law of Admiralty 364 (2d ed. 1975); D. Robertson, Admiralty and Federalism 224 (1970); 1 E. Benedict, Law of Admiralty §§ 143, 148, pp. 385–386, 394, and n. 57 (6th ed. 1940); Day, Maritime Wrongful Death and Survival Recovery: The Need for Legislative Reform, 64 Colum. L. Rev. 648, 651 (1964); Hughes, Death Actions in Admiralty, 31 Yale L. J. 115, 122–123 (1921); Note, Maritime Wrongful Death After *Moragne:* The Seaman's Legal Lifeboat, 59 Geo. L. J. 1411, 1417 (1971); Note, The Tangled Seine: A Survey of Maritime Personal Injury Remedies, 57 Yale L. J. 243 (1947). Cf. *Sea-Land Services, Inc.* v. *Gaudet*, 414 U. S. 573, 588, and n. 22 (1974) (discussing availability of certain elements of damages on territorial waters under federal maritime law on the clear assumption that state damages remedies not available on high seas). But see *Alexander* v. *United Technologies Corp.*, 548 F. Supp. 139, 142–143 (Conn. 1982); *In re Complaint of Exxon Corp.*, 548 F. Supp. 977, 978 (SDNY 1982).

date that § 7 be read not as an endorsement of the application of state wrongful death statutes to the high seas, but rather as a jurisdictional saving clause. Viewed in this light, § 7 serves not to destroy the uniformity of wrongful death remedies on the high seas but to facilitate the effective and just administration of those remedies. The recognition of concurrent state jurisdiction to hear DOHSA actions makes available to DOHSA beneficiaries a convenient forum for the decision of their wrongful death claims. See Note, Admiralty: Death on the High Seas by Wrongful Act, 47 Cornell L. Q. 632, 638 (1962) (hereinafter Note). Because the resolution of DOHSA claims does not normally require the expertise that admiralty courts bring to bear, DOHSA actions are clearly within the competence of state courts to adjudicate. See ALI Study, at 237; Note, at 637. Also, the availability of concurrent jurisdiction prevents disunity in the provision of forums to survivors of those killed on the high seas; it ensures that if a seaman and a passenger are killed at sea in the same accident, the beneficiaries of both are able to choose the forum in which they prefer to proceed. See *Engel* v. *Davenport*, 271 U. S. 33 (1926) (state and federal courts have concurrent jurisdiction over Jones Act claims). See also ALI Study § 1316(b), at 237; Note, at 638. Cf. also *Gulf Offshore Co.* v. *Mobil Oil Corp.*, 453 U. S. 473 (1981) (recognizing state courts' concurrent jurisdiction over OCSLA claims).

Once it is determined that § 7 acts as a jurisdictional saving clause, and not as a guarantee of the applicability of state substantive law to wrongful deaths on the high seas, the conclusion that the state statutes are pre-empted by DOHSA where it applies is inevitable. As we held in *Higginbotham*, Congress has "struck the balance for us" in determining that survivors should be restricted to the recovery of their pecuniary losses, and when DOHSA "does speak directly to a question, the courts are not free to 'supplement' Congress' answer so thoroughly that the Act becomes meaningless." 436 U. S., at 625.

Admittedly, in the circumstances of this case, the recognition of a state damages remedy for loss of society would bring respondents' DOHSA recovery into line with the damages available to a beneficiary of a federal *Moragne* maritime cause of action arising from a death on territorial waters. See *Sea-Land Services, Inc.* v. *Gaudet*, 414 U. S. 573 (1974) (holding that awards under the general federal maritime cause of action for wrongful death could include compensation for loss of society). However, the questionable practical significance of this difference in recovery, see *Mobil Oil Corp.* v. *Higginbotham, supra*, at 624, and n. 20, is far overshadowed by the potential for serious conflicts between DOHSA and state substantive law in such areas as limitations periods, classes of beneficiaries, and the definition of potential defenses. We defer to Congress' purpose in making a uniform provision for recovery for wrongful deaths on the high seas, an area where the federal interests are primary.

The judgment of the Court of Appeals for the Fifth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, concurring in part and dissenting in part.

The Court today holds that § 7 of the Death on the High Seas Act (DOHSA), 41 Stat. 538, 46 U. S. C. § 767, forecloses application of state remedies for wrongful deaths on the high seas. Thus, the Court confines state courts to the adjudication of causes of action brought under DOHSA. Because I believe that the Court's reading of § 7 is at odds with the language of the statute and its legislative history, I dissent.[1]

---

[1] I agree with the Court's conclusion that the Outer Continental Shelf Lands Act, 67 Stat. 462, as amended, 43 U. S. C. § 1331 *et seq.*, does not govern this action, and therefore join Part III of the Court's opinion.

## I

In the early judicial history of the United States, a few courts of admiralty, moved by humanitarian considerations, found in general maritime law a right of action for wrongful death. As Chief Justice Chase noted in an often-quoted passage: "[C]ertainly it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rules." *The Sea Gull,* 21 F. Cas. 909, 910 (No. 12,578) (CC Md. 1865). See *The Highland Light,* 12 F. Cas. 138, 139 (No. 6,477) (CC Md. 1867) ("The admiralty may be styled, not improperly, the human providence which watches over the rights and interests of those 'who go down to the sea in ships'"). In 1886, however, this Court in *The Harrisburg,* 119 U. S. 199, held that such a right of recovery was not provided by general maritime law, but instead must be created by a state or federal statute.[2]

At the time of *The Harrisburg,* no federal statute afforded a right of action for wrongful death at sea. See *id.,* at 213. Many States, including Louisiana, had statutes that granted a right of action for wrongful death generally, and lower federal courts had begun to enforce such rights in admiralty.[3]

_____

[2] The Court stated:

"The argument everywhere in support of [wrongful death] suits in admiralty has been, not that the maritime law, as actually administered in common law countries, is different from the common law in this particular, but that the common law is not founded on good reason, and is contrary to 'natural equity and the general principles of law.' Since, however, it is now established that in the courts of the United States no action at law can be maintained for such a wrong in the absence of a statute giving the right, and it has not been shown that the maritime law, as accepted and received by maritime nations generally, has established a different rule for the government of the courts of admiralty from those which govern courts of law in matters of this kind, we are forced to the conclusion that no such action will lie in the courts of the United States under the general maritime law." 119 U. S., at 213.

[3] See cases cited in 754 F. 2d 1274, 1277, n. 1 (CA5 1985).

In 1907, the Court confirmed the power of a State to provide a right of action for wrongful death upon the high seas. *The Hamilton*, 207 U. S. 398. This power, however, created jurisdictional fictions and serious problems in choice of law that sometimes denied recovery altogether. See *Wilson* v. *Transocean Airlines*, 121 F. Supp. 85, 88–89 (ND Cal. 1954).

As a result, from 1898 to 1917 legislators in Congress introduced several bills that would have provided an exclusive federal right of action for wrongful death on all navigable waters. *Id.*, at 89, nn. 8 and 9. These proposals met with an unbroken string of defeats, primarily because of considerable local opposition to any federal displacement of the operation of state wrongful-death statutes on territorial waters. *Ibid.* Finally, in the predecessor of § 7 of DOHSA, proposed legislation provided a uniform federal right of action for death on the high seas, and left unaffected the operation of state statutes on territorial waters. S. 4288, 64th Cong., 1st Sess. (1916); H. R. 9919, 64th Cong., 1st Sess. (1916). The bill was favorably reported by both Houses. S. Rep. No. 741, 64th Cong., 1st Sess. (1916); H. R. Rep. No. 1419, 64th Cong., 2d Sess. (1917). The same bill was introduced again in the House on the opening day of the 65th Congress. H. R. 39, 65th Cong., 1st Sess. (1917). Congress took no action on that bill, presumably because the United States entered World War I four days later.

Following World War I, the bill was reintroduced in the 66th Congress. S. 2085, 66th Cong., 1st Sess. (1919). The Senate passed the bill without material amendment. As it then stood, the bill provided in § 1 a right to maintain a suit in admiralty for wrongful death on the high seas. Section 7 of the bill, crucial to the disposition of the issue here today, stated that "the provisions of any State statute giving or regulating rights of action or remedies for death shall not be affected by this Act *as to causes of action accruing within the territorial limits of any State.*" (Emphasis added.)

Before the bill went to the floor of the House, it was clear from the language of the bill and from the Reports of the Senate and the House Judiciary Committees that the federal right of action would be exclusive for deaths on the high seas and that the state wrongful-death statutes would provide the right of action for deaths on territorial waters. S. Rep. No. 216, 66th Cong., 1st Sess. (1919); H. R. Rep. No. 674, 66th Cong., 2d Sess. (1920). As the Court correctly observes: "§ 7, as originally proposed, ensured that [DOHSA] saved to survivors of those killed on territorial waters the ability to pursue a state wrongful death remedy in state court." *Ante,* at 225.

Had the bill passed in that form, the resolution of this case would be clear—the federal statute would preclude application of state law for respondents' cause of action. During the floor debate in the House of Representatives, however, Representative Mann from Illinois successfully offered an amendment striking from § 7 the concluding phrase, "as to causes of action accruing within the territorial limits of any State." Thus, although the original § 7 preserved state-law rights of action within territorial waters, the ultimately enacted § 7 preserved these rights of action without geographic qualification. Although § 7 is plainly intended to save state remedies for death on the high seas, the Court today ignores the section's language and holds that it is a jurisdictional saving clause.

II

The starting point in statutory construction is, of course, the language of the statute itself. *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 756 (1975) (POWELL, J., concurring). See *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.,* 447 U. S. 102 (1980). The language of § 7, given scant attention by the Court, reads as codified:

"§ 767. Exceptions from operation of chapter

"The provisions of any State statute *giving or regulating rights of action or remedies for death* shall not be af-

fected by this chapter. Nor shall this chapter apply to the Great Lakes or to any waters within the territorial limits of any State, or to any navigable waters in the Panama Canal Zone." 46 U. S. C. § 767 (emphasis added).

The terms of the provision are clear. The provision preserves state rights of action and state remedies for wrongful death without any territorial qualification. It encompasses not only jurisdiction, but also "rights of action" and "remedies." The geographic reach of these traditional rights of action is therefore undiminished by DOHSA.

The congressional debate and other legislative history cast no doubt on the plain meaning of § 7. It is true, as the Court states, that the debate on the Mann Amendment was "exceedingly confused and often ill informed." *Ante,* at 225. Judge Davis, who made a meticulous review of the congressional debate in his opinion for the Court of Appeals, stated:

> "The congressional debate reflects a number of differing concerns and beliefs on the part of the legislators. These include whether the federal courts would have exclusive jurisdiction of DOHSA claims and whether causes of action granted by state statutes would be affected or preempted by DOHSA. The debate is not couched in the most precise legal terminology, and it appears that the term 'jurisdiction' was used indiscriminately to refer to both the power of state or federal courts to hear a particular case and the power of a state to grant a right of recovery. . . . In this circumstance, an attempt to discern the congressional intent from the conflicting statements by participants in the debate is hopeless. It is also unnecessary in light of the clear language of the statute. Absent a clearly-expressed legislative intention to the contrary, the plain words of the statute must ordinarily be regarded as controlling." 754 F. 2d 1274, 1280–1282 (1985).

Despite the confusion of the debate, it *is* clear that the Mann Amendment removed the clause that expressly limited state remedies "to causes of action accruing within the territorial limits of any State." Accordingly, § 7, once confined to territorial waters, on its face extends to the high seas as well. Today's holding, by barring state rights of action for deaths occurring on the high seas, limits § 7 in a manner that Congress expressly rejected. Whatever the policy advantages such a reading may have, it is inappropriate for this Court to make the "judgment that Congress intended a result that it expressly declined to enact." *Gulf Oil Corp.* v. *Copp Paving Co.,* 419 U. S. 186, 200 (1974).

### III

The Court attempts to explain its holding through a comparison of § 7 with § 4 of DOHSA, and with the "saving to suitors" clause in the Judiciary Act of 1789, § 9, 1 Stat. 76 (codified, as amended, at 28 U. S. C. § 1333). I find neither argument convincing. Section 4 preserves "a right of action . . . granted by the law of any foreign State . . . *without abatement in respect to the amount for which recovery is authorized,* any statute of the United States to the contrary notwithstanding." (Emphasis added.) It is true that the italicized language is absent from § 7. But § 7 contains its own explicit language, since it expressly provides that state statutes "giving *or regulating rights of action or remedies for death* shall not be affected by this Act." (Emphasis added.) Thus, by its terms, § 7 protects the operation of state statutes that *either* create rights of action for wrongful death *or* "regulat[e]" the amount of those rights of action. That clear purpose is inconsistent with the notion that § 7 fails to preserve state-law rights of action on the high seas.

The Court's second argument, never advanced by any of the federal courts that have considered this issue, is that § 7 is merely a "jurisdictional saving clause" that preserves state courts' power to entertain certain causes of action for wrong-

ful death. I cannot accept this argument because it is inconsistent not only with the plain language of the provision, but also with one of the clear purposes of § 7.

The Court concedes that the original version of § 7 preserved both state-law remedies for wrongful death occurring within territorial waters and state jurisdiction over those remedies. *Ante*, at 224, 225 ("§ 7, as originally proposed, ensured that the Act saved to survivors of those killed on territorial waters the ability to pursue a state wrongful death remedy in state court"). The Court then asserts, however, that the Mann Amendment "extended the jurisdictional saving clause to the high seas but in doing so, it did not implicitly sanction the operation of state wrongful death statutes on the high seas in the same manner as the saving clause did in territorial waters." *Ante*, at 227.

It is not easy to understand how § 7 was transformed from a provision that preserved both state jurisdiction and state rights of action in territorial waters, into a mere "jurisdictional saving clause" with no power to preserve state rights of action on the high seas. The Mann Amendment did nothing more than remove a territorial restriction; all other clauses of § 7 remained intact. As Representative Mann stated: "If the amendment which I have suggested should be agreed to, the bill *would not interfere in any way with rights now granted by any State statute*, whether the cause of action accrued within the territorial limits of the State or not." 59 Cong. Rec. 4484 (1920) (emphasis added). Moreover, as already noted, construing § 7 as preserving only state jurisdiction on the high seas is at odds with the terms of the provision itself. The language plainly refers to "[t]he provisions of any State statute giving or regulating rights of action or remedies for death."[4]

--------

[4] Nor does the Court's extended discussion of *Southern Pacific Co.* v. *Jensen*, 244 U. S. 205 (1917), see *ante*, at 224, 227–228, explain its view that the Mann Amendment converted § 7 into a jurisdictional saving clause. It is true that the uniformity requirement in *Jensen* was broad enough on

As final support for its reading of § 7, the Court argues that it would be "incongruous" to read § 7 as "preserv[ing] intact largely nonexistent or ineffective state law remedies for wrongful death on the high seas." *Ante*, at 230. Aside from the question whether this argument accurately portrays state-law remedies for death on the high seas, see *The Hamilton*, 207 U. S. 398 (1907) (Delaware right of action for wrongful death on the high seas); *La Bourgogne*, 210 U. S. 95, 138 (1908) (similar Louisiana statute, direct precedessor of current respondents' claim), it certainly is plausible to suggest that Congress may have wished to establish an assured and uniform federal right of action for wrongful death at sea. And in the light of the adoption of the Mann Amendment, it is not "incongruous" to believe that Congress, in providing that federal right of action, also decided to preserve the array of state-law remedies because these remedies sometimes—as is the case here—conferred upon a State's residents rights of recovery beyond those of the federal statute.

## IV

The Court argues that preserving state rights of action for death on the high seas, in accordance with the plain language of § 7, would undermine a uniform federal remedy and conflict with the exclusive, federal character of most aspects of admiralty law. I agree that such a result undercuts a federal uniformity that seems desirable here, but it is not the role of this Court to reconsider the wisdom of a policy choice that Congress has already made. Congress enacted the Mann Amendment to remove the territorial restriction from § 7's preservation of state-law rights of action for wrongful death.

its face to foreclose state wrongful-death rights of action. (But cf. 244 U. S., at 216 (state wrongful-death statute expressly exempted from *Jensen* rule)). Congress therefore might have believed that an express reservation of state-law rights of action was necessary to save state causes of action after Congress had enacted DOHSA. This concern, however, does not explain how the Mann Amendment transformed § 7 into a *jurisdictional* saving clause.

The Court now holds that those rights of action may not be enforced on the high seas, and thereby imposes an *exclusive* federal remedy that Congress declined to enact. We should respect the outcome of the legislative process and preserve State rights of action for wrongful death on the high seas until Congress legislates otherwise. Accordingly, I dissent.