**Nancy BLOME, individually and as Next Friend of Charles Blome, II, and Katie Blome, Minor Children, and as Personal Representative of the Estate of Charles Blome, Jr., Deceased,**

**v.**

**AEROSPATIALE HELICOPTER CORPORATION, Societe Nationale Industrielle Aerospatiale, Aerospatiale Capital Corporation, American Eurocopter Corporation, Sea Link Helicopters, Inc., Tex–Air Helicopters, Inc., Anthony A. Loague, John Lockwood, and Ann Lockwood.**

Civil Action No. G–95–082.

United States District Court,
S.D. Texas,
Galveston Division.

April 30, 1996.

█

Ernest H. Cannon, Ernest Cannon & Associates, Houston, TX, for plaintiffs.

Michael Vance Powell, Locke Purnell Rain & Harrell, PC, Dallas, TX, William L. Robinson, Lillick & Charles, Long Beach, CA, for Aerospatiale Helicopter Corp., Societe Nationale Industrielle Aerospatiale, Aerospatiale, Inc., Aerospatiale Capital Corporation, American Eurocopter Corporation.

James Lane Ware, McLeod Alexander Powel & Apffel, PC, Galveston, TX, Kenneth H. Laborde, Leo R. McAloon, III, Pulaski Gieger & Laborde, New Orleans, LA, for Tex–Air Helicopters.

James Richard Watkins, Jr., Royston, Rayzor, Vickery & Williams, Galveston, TX, for Nalling Shipping Ltd., Nevis Shipping Ltd., Red Band, defendant.

James Martin Davin, Houston, TX, for R & O Motorship Agencies Texas, Inc.

Harold H. Walker, Jr., Gardere, Wynne, Sewell & Riggs, LLP, Houston, TX, Michael William Kerensky, O'Quinn Kerensky & McAninch, Houston, TX, William J. Clay, Martin E. Rose, Gardere & Wynne, Dallas, TX, for Sea Link Helicopters, Inc., Anthony A. Loague, John Lockwood, Ann Lockwood.

Michael R. McGown, Beaumont, TX, for Charles Blome, Sr.

## ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT

KENT, District Judge.

Charles Blome, Jr., an inspector for the United States Coast Guard, was killed when the helicopter transporting him to a vessel to be inspected crashed into the Gulf of Mexico offshore Galveston, Texas. The Plaintiffs, Blome's wife, children, and his estate, sued, among others, Sea Link Helicopters, Inc. (Sea Link), which operated the helicopter, American Eurocopter Corporation (AEC), which leased the helicopter to Sea Link, and Societe Nationale Industrielle Aerospatiale (SNIA), which manufactured the helicopter. Now before the Court is the Motion of AEC and SNIA for Partial Summary Judgment against the Plaintiffs' claims.[1] As will be discussed in detail below, the Motion is **DENIED.**

### I.

The Plaintiffs filed suit against the Defendants in Texas state court, seeking recovery under the Texas wrongful death and survival statutes, Tex.Civ.Prac. & Rem. §§ 71.001–.051.[2] The action was removed to this Court pursuant to 28 U.S.C. § 1441(b), because one of the Defendants is a foreign state as defined in the Foreign Sovereign Immunities Act, 28 U.S.C. § 1603. In their wrongful death action, the Plaintiffs seek recovery for economic losses, mental pain and anguish, grief, and loss of consortium, as well as punitive damages. In the survival action, the Plaintiffs seek recovery for the decedent's pre-death pain and suffering.

In their Motion for Partial Summary Judgment, AEC and SNIA[3] contend the Plaintiffs' wrongful death action is governed by the Death on the High Seas Act, 46 U.S.C. App. §§ 761–67 (DOHSA), which prohibits the Plaintiffs' claims for punitive and nonpecuniary damages.[4] Therefore, if federal law

---

1. AEC's and SNIA's Motion for Summary Judgment against the cross-claim asserted by Sea Link, and Sea Link's Motion for Judgment on the cross-claim asserted by AEC will be addressed in a separate order.

2. A wrongful death action allows beneficiaries to recover damages for injuries they suffered as a result of the decedent's death. A survival action allows the estate or successors of the decedent to recover damages for injuries suffered by the decedent for which the decedent could have recovered but for his death. *Miles v. Melrose*, 882 F.2d 976, 985 (5th Cir.1989), *aff'd sub nom. Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990); *Azzopardi v.*

*Ocean Drilling & Exploration Co.*, 742 F.2d 890, 893 (5th Cir.1984); *Rohan v. Exxon Corp.*, 896 F.Supp. 666, 671 (S.D.Tex.1995).

3. For the remainder of this Order, the Court will refer to AEC and SNIA together as the Defendants.

4. DOHSA limits recovery to "pecuniary loss sustained by the person for whose benefit the suit is brought." 46 U.S.C. app. 762. Damages for grief, loss of society or consortium, mental anguish or emotional distress are all types of nonpecuniary damages that cannot be recovered under DOHSA. *See, e.g., Miles v. Apex Marine Corp.*, 498 U.S. 19, 30–33, 111 S.Ct. 317, 324–26,

governs the Plaintiffs' claims, the recovery available to them is substantially less than the recovery available under state law.[5]

■ DOHSA creates a wrongful death action sounding in admiralty for the death of a person "occurring on the high seas beyond a marine league [6] from the shore of any State." 46 U.S.C.App. § 761. If DOHSA applies, the remedies it supplies are exclusive and cannot be supplemented with wrongful death remedies under the general maritime law or state law. *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 232, 106 S.Ct. 2485, 2499, 91 L.Ed.2d 174 (1986); *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 623–25, 98 S.Ct. 2010, 2014–15, 56 L.Ed.2d 581 (1978). The evidence presented to the Court establishes that the crash which killed Blome occurred somewhere between seven and eleven miles offshore Galveston, Texas. Because there is no dispute that the accident occurred more than one league offshore, the Defendants contend that DOHSA applies as a matter of law to the Plaintiffs' wrongful death claims.

The Plaintiffs, however, contend there is a question of fact as to whether DOHSA or state law governs their claim. The territorial boundary of Texas is three marine leagues offshore. Tex.Nat.Resources Code § 11.012. While DOHSA states it applies to deaths occurring more than a marine league offshore, the statute also states that the "provisions of any State statute giving or regulating rights of action or remedies for death shall not be affected by this chapter. Nor shall this chapter apply ... to any waters within the territorial limits of any State." 46 U.S.C.App. § 767. Because DOHSA does not apply to state territorial waters, the

Plaintiffs argue that, as to deaths occurring offshore Texas, DOHSA applies only if the death occurred more than three marine leagues offshore. If the crash occurred eleven miles offshore, it occurred outside Texas territorial waters, and DOHSA is applicable. However, if the crash occurred seven miles offshore, it occurred within Texas territorial waters, and DOHSA does not apply. Accordingly, the Plaintiffs contend that summary judgment cannot be granted, because there is a question of fact that must be resolved before it can be determined whether state or federal law governs.[7]

Thus, disposition of the Defendants' Motion requires the Court to resolve two issues. First, the Court must determine whether state wrongful death and survival statutes can be applied in maritime actions involving the death of a non-seaman on territorial waters. If state law cannot apply, then the Court need go no further. However, if state law can apply in cases involving deaths on territorial waters, the Court must then determine the extent of Texas territorial waters.

## II.

■ Although this case does not involve the vessels or seamen which are characteristic of most maritime cases, the Plaintiffs' claims nonetheless fall within the Court's admiralty jurisdiction. To invoke admiralty tort jurisdiction, the injury or incident must have occurred on navigable waters, and the general character of the activity giving rise to the incident must bear a substantial relationship to traditional maritime activity. *Jerome B. Grubart, Inc. v. Great Lakes Dredge*

---

112 L.Ed.2d 275 (1990). Punitive damages are also considered to be nonpecuniary, *see, e.g., Guevara v. Maritime Overseas Corp.,* 59 F.3d 1496, 1506 (5th Cir.1995) (en banc), *cert. denied,* —— U.S. ——, 116 S.Ct. 706, 133 L.Ed.2d 662 (1996), and, thus, are not recoverable under DOHSA.

5. The Plaintiffs initially sought recovery of the decedent's future earnings and punitive damages in their survival action. However, the Plaintiffs recently amended their Complaint and dropped these claims. The Court, therefore, will not consider the recoverability of these elements of damages under the general maritime law or Texas law.

6. A marine league is approximately three nautical miles.

7. Of course, summary judgment is appropriate only if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. A fact is material if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should not be granted if the evidence indicates that a reasonable fact finder could find in favor of the non-moving party. *Id.*

& Dock Co., — U.S. —, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). The helicopter crash occurred in the Gulf of Mexico, thus satisfying the locality requirement. The nexus to traditional maritime activity requirement is likewise satisfied, because, by transporting a Coast Guard inspector from shore to a vessel, the helicopter was performing an activity traditionally performed by vessels. *See Tallentire,* 477 U.S. at 218–19, 106 S.Ct. at 2492 (admiralty jurisdiction properly invoked in a case involving a helicopter crash "because the accident occurred on the high seas and in furtherance of an activity bearing a significant relationship to a traditional maritime activity. Although the decedents were killed while riding in a helicopter and not a more traditional maritime conveyance, that helicopter was engaged in a function traditionally performed by waterborne vessels: the ferrying of passengers from an 'island,' albeit an artificial one, to the shore.") (citation omitted).

■ Of course, with "admiralty jurisdiction comes the application of substantive admiralty law." *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 864, 106 S.Ct. 2295, 2298–99, 90 L.Ed.2d 865 (1986). However, that this case is within the Court's admiralty jurisdiction does not mean, in and of itself, that state law cannot apply. As in other areas governed by federal law, federal courts sitting in admiralty have frequently borrowed or adopted state law as the rule of decision. *Calhoun v. Yamaha Motor Corp. U.S.A.,* 40 F.3d 622, 627–28 (3d Cir. 1994), *aff'd,* — U.S. —, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996). Broadly stated, state law may be applied in admiralty cases unless it conflicts with federal law by "prejudic[ing] the 'characteristic features' of federal maritime law, or interfer[ing] with the 'proper harmony and uniformity of that law.'" *Calhoun,* 40 F.3d at 628 (quoting *Southern Pac. Co. v. Jensen,* 244 U.S. 205, 216, 37 S.Ct. 524, 529, 61 L.Ed. 1086 (1917)).

Since the Supreme Court's decision in *Moragne v. States Marine Lines,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), which first recognized a wrongful death cause of action under the general maritime law, many courts have concluded that the general maritime law provides the exclusive remedies for maritime deaths, preempting state statutes. *See, e.g., Wahlstrom v. Kawasaki Heavy Indus., Ltd.,* 4 F.3d 1084, 1087–88 (2d Cir.1993) ("federal maritime law, whether or not it conflicts with state law, applies to actions for wrongful death in state territorial waters"), *cert. denied,* — U.S. —, 114 S.Ct. 1060, 127 L.Ed.2d 380 (1994); *Nelson v. United States,* 639 F.2d 469, 473 (9th Cir.1980) (*Moragne* cause of action applies to exclusion of state wrongful death statutes); *In re S/S Helena,* 529 F.2d 744, 753 (5th Cir.1976) (*Moragne* wrongful death remedy precludes recognition of state statutes in admiralty). These decisions were generally grounded upon the belief that the disparate remedies allowed under the state statutes was inconsistent with the desire for uniformity in maritime remedies which guided the Supreme Court's decisions in *Moragne* and subsequent cases.

However, in *Yamaha Motor Corp., U.S.A. v. Calhoun,* — U.S. —, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996), the Supreme Court held that a state's wrongful death and survival statutes are not preempted by federal law in cases involving the death of a non-seaman in state territorial waters. To reach its decision, the *Yamaha* Court engaged in the all-too-familiar review of the tortured development of a wrongful death cause of action in maritime cases.[8] Before *Moragne* was decided, the application of state wrongful death and survival statutes to deaths occurring in state territorial waters was "compatible with substantive maritime policies." *Id.* at —, 116 S.Ct. at 624 (citing *Western Fuel Co. v. Garcia,* 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210 (1921) (action involving death in California territorial waters governed by California

---

**8.** This Court assumes that the readers of this case are thoroughly familiar with the development of the maritime wrongful death cause of action from *The Harrisburg,* 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886), through *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 90 S.Ct. 1772,

26 L.Ed.2d 339 (1970), and *Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). To the extent possible, the Court will not subject the readers of this case to yet another lesson in this particular chapter of American legal history.

wrongful death statute) and *Just v. Chambers*, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941) (applying Florida survival statute to case involving death in Florida territorial waters)). The Supreme Court concluded that the general maritime wrongful death cause of action announced in *Moragne* was intended assure "uniform vindication of federal policies" by correcting certain anomalies that had developed in the law "relating to ships and the workers who serve them, and to a distinctly maritime substantive concept—the unseaworthiness doctrine." —— U.S. at ——, 116 S.Ct. at 627. Therefore, because the Court viewed *Moragne* as extending the relief available to seamen rather than contracting the remedies available under the maritime law, the Court concluded that *Moragne* general maritime wrongful death cause of action did not preempt the application of state wrongful death statutes in territorial waters. *Id.* at ——, 116 S.Ct. at 627–28.

Finally, the Court determined that the application of state statutes in territorial waters was not inconsistent with any federal *statutory* scheme, because Congress has not established remedies for the deaths of non-seamen in territorial waters. Instead, as will be discussed below, DOHSA evinces Congressional intent that state statutes remain applicable to deaths occurring in state territorial waters. *Id.* at ——, 116 S.Ct. at 628. Accordingly, the Court concluded that the damages available under the wrongful death and survival claims were governed by state law. *Id.* at ——, 116 S.Ct. at 629.[9]

*Yamaha* thus definitively resolves the first issue presented by this Motion—the Texas wrongful death and survival statutes apply if the crash that killed the Plaintiffs' decedent occurred in state territorial waters. Therefore, the Court must now proceed to the second issue in this case—the reach of the territorial waters of Texas.

### III.

The determination of the reach of Texas territorial waters requires a look at the development of the states' claims to ownership of offshore territorial waters and the lands beneath those waters. In *United States v. California*, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947), the Supreme Court rejected California's claim to dominion over the waters three miles off its coast and ownership of the land underneath those waters. The Court concluded the federal government possessed paramount rights to the land seaward of the low-water mark on California's coast and beyond inland waters. 332 U.S. at 36, 67 S.Ct. at 1667. Thus, the federal government, not California, had control over the valuable minerals then recently discovered under the seabed. *Id.* at 38, 67 S.Ct. at 1668. The Court announced similar rulings with regard to the claims of Texas and Louisiana to the submerged lands in the Gulf of Mexico. *United States v. Louisiana*, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 (1950); *United States v. Texas*, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950). In response to these decisions, Congress made several unsuccessful attempts to vest coastal states with rights in submerged lands. *See United States v. Louisiana*, 363 U.S. 1, 6, 80 S.Ct. 961, 966–67, 4 L.Ed.2d 1025 (1960) (*Louisiana II*). Finally, in 1953, Congress passed the Submerged Lands Act (SLA), 43 U.S.C. §§ 1301–1315, which relinquished to the coastal states the rights of the United States in submerged lands within certain geographical limits. *Id.* The stated purpose of the SLA was to

> confirm and establish the titles of the States to lands beneath navigable waters within State boundaries and to the natural resources within such lands and waters, ... and to confirm the jurisdiction and control of the United States over the natural resources of the seabed of the Continental Shelf seaward of State boundaries.

*Louisiana II*, 363 U.S. at 8, 80 S.Ct. at 967. The SLA accomplished its goals by relinquishing to the states the federal interest in all lands located beneath navigable waters

---

9. The *Yamaha* Court's analysis, particularly its discussion of the type of uniformity sought in *Moragne*, may cast some doubt on the multitude of cases that have read *Miles v. Apex Marine Corp.* very broadly and applied its analysis and rationale to factual situations not involving seamen.

within state boundaries. 43 U.S.C. § 1311(b)(1). The SLA defines state boundaries as the boundaries as they existed at the time the state became a member of the Union or "as heretofore approved by Congress," provided such boundaries do not extend more than three geographical miles in the Atlantic and Pacific Oceans, or three marine leagues in the Gulf of Mexico. 43 U.S.C. § 1301(b). In addition, the SLA confirms to each state a seaward boundary of three geographical miles "without questioning or in any manner prejudicing the existence of any State's seaward boundary beyond three geographical miles if it was so provided by its constitution or laws prior to or at the time such State became a member of the Union, or if it has been heretofore approved by Congress." 43 U.S.C. § 1312; *see Louisiana II*, 363 U.S. at 8–10, 80 S.Ct. at 968.

In *Louisiana II*, the narrow issue before the Court was ownership of the submerged lands between three miles and three leagues offshore in the Gulf of Mexico. The Court concluded that the SLA vested ownership rights in the lands beyond three miles *only* if the state's original or Congressionally approved boundary extended beyond three miles. 363 U.S. at 13, 80 S.Ct. at 970. The Court rejected the claims of Louisiana, Mississippi, and Alabama that their boundaries extended three leagues offshore. However, the Court concluded that the Texas boundary extended to three marine leagues. After thoroughly reviewing the claim of the Republic of Texas to a three league boundary, the Court concluded that Congress approved of and fixed the Texas seaward boundary at three leagues offshore through the 1848 Treaty of Guadalupe Hildago, and reaffirmed that boundary in the Gadsen Treaty of 1853 and a series of subsequent international conventions. 363 U.S. at 60–64, 80 S.Ct. at 994–97. Thus, Texas was entitled to submerged lands beneath the Gulf of Mexico for a distance of three leagues. *Id.* at 64, 80 S.Ct. at 996–97.[10]

The Plaintiffs rely on the Supreme Court's approval of the three league boundary in *Louisiana II* to support their argument that DOHSA may not apply to their claims. Section 767 of DOHSA provides that it does not apply to state territorial waters; thus, the Plaintiffs argue that, as to deaths occurring offshore Texas, DOHSA applies only if the death occurred more than three marine leagues offshore. Because there is evidence that the crash which killed Blome occurred seven miles offshore, within the three league boundary, the Plaintiffs argue that a question of fact remains as to whether their claims are governed by DOHSA or state law.

The Defendants, however, contend the Plaintiffs read too much into the Court's holding in *Louisiana II*. According to the Defendants, the only issue before the Court in *Louisiana II* was ownership of submerged lands under the SLA. Whatever the seaward boundary of Texas may be for the purposes of the SLA, it has no effect on the territorial restrictions contained in DOHSA. Because section 761 of DOHSA states the statute applies to deaths occurring more than one marine league offshore, the Defendants contend DOHSA applies to the Plaintiffs' claims as a matter of law, whether the crash occurred seven miles or eleven miles offshore. The Court disagrees.

As discussed above, the SLA vested ownership rights in submerged lands in the states by reference to established state boundaries. Thus, while the narrow issue in *Louisiana II* was ownership of lands under the SLA, the structure of the SLA required a determination of state boundaries in order to resolve the ownership issues. Accordingly, the Court's discussion of the seaward boundary of Texas cannot be limited in its application to the SLA. Because the Supreme Court in *Louisiana II* clearly held that Congress fixed and approved the Texas seaward boundary at three leagues offshore, 363 U.S. at 64, 80 S.Ct. at 997 ("Texas' maritime boundary was established at three leagues from its Coast for domestic purposes"), this Court accepts that boundary for the purposes of this Motion.

Given the federal government's power over interstate commerce and maritime matters, there is no doubt that Congress has the power to enact statutes that are applicable

10. The three league boundary is codified in Tex.Nat.Resources Code § 11.012.

within state territorial waters and preempt state laws. The question is whether DOHSA is one of those statutes—that is, does DOHSA apply to all deaths occurring more than one league offshore regardless of state territorial boundaries, or does DOHSA apply to deaths occurring more than one league offshore only if the death did not occur in the territorial waters of any state.[11]

When construing a statute, a court's task is to give effect to the will of Congress. If the will of Congress has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive. *Negonsott v. Samuels*, 507 U.S. 99, 104, 113 S.Ct. 1119, 1122, 122 L.Ed.2d 457 (1993). The court should not be guided by a single sentence of the statute, but must look to the language of the statute as a whole, and the statute's object and policy. *United States Nat. Bank of Oregon v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 453–55, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402 (1993); *Tallentire*, 477 U.S. at 220–21, 106 S.Ct. at 2493–94. With these general principles in mind, the Court will examine the apparently conflicting provisions of DOHSA that have given rise to this dispute.

As noted above, section 761 provides that DOHSA applies to deaths occurring on the high seas more than one marine league offshore, while section 767 states that DOHSA shall not apply "to any waters within the territorial limits of any State." 46 U.S.C. App. § 767. Reading these sections together, the Court concludes that the only natural interpretation of DOHSA is that the statute applies to deaths occurring more than one marine league from shore unless the death occurred in state territorial waters. To con-

clude otherwise would be to ignore the plain and meaning of the language carefully and specifically chosen by Congress. If Congress had intended the geographic exception contained in section 767 to precisely reflect the geographic reach of the statute contained in section 761, it would have used the same geographic terms in both sections. That is, section 767 would have provided that DOHSA did not apply to deaths occurring within one marine league offshore. By using different geographic terms in sections 761 and 767, the Court must presume that Congress intended the sections to have different meanings and different geographic reaches. *See, e.g., Tallentire*, 477 U.S. at 222, 106 S.Ct. at 2494 ("Normal principles of statutory construction require that we give effect to the subtleties of language that Congress chose to employ"); *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir.1972)).

This interpretation is consistent with the purpose and policy of DOHSA. As all admiralty practitioners are aware, it was not until 1970 that a wrongful death cause of action was recognized as a part of the general maritime law. *See The Harrisburg*, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886) (no wrongful death cause of action exists under the general maritime law), *overruled, Moragne v. States Marine Lines*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) (recognizing cause of action). Before *Moragne*, admiralty

---

11. This question will be important primarily in Texas and Florida, because, as far as the Court can determine, these are the only states with seaward boundaries extending beyond three miles. *See United States v. Florida*, 363 U.S. 121, 128, 80 S.Ct. 961, 1030, 4 L.Ed.2d 1025 (1960) (by virtue of its approval of Florida's Constitution upon Florida's readmission to Union after the Civil War, Congress approved the three league boundary provided for in the Florida Constitution). However, this question may also arise in states where the boundary is three miles. DOHSA applies to deaths occurring more than one league *offshore*. Therefore, depending on the

beginning point for the measurement of the state's boundary, a death could occur more than three miles offshore, but still be within a state's boundary. *See, e.g., Hernandez v. Freeport McMoran, Inc.*, No. 92–1326 (1992 WL 161171) (E.D.La. June 23, 1992) (accident occurring seven miles offshore nonetheless occurred within Louisiana territorial waters, because, pursuant to *United States v. Louisiana*, 452 U.S. 726, 101 S.Ct. 2605, 69 L.Ed.2d 368 (1981), Louisiana's official boundary is measured from her coast as it existed at the time Louisiana was admitted to the union).

courts ameliorated the harshness of the rule of *The Harrisburg* by applying state wrongful death and survival statutes to cases arising within state territorial waters. *See, e.g., Western Fuel Co. v. Garcia,* 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210 (1921) (state wrongful death statute); *Just v. Chambers,* 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941) (state survival statute).

In 1920, Congress enacted DOHSA to fill the gap left by *The Harrisburg* by creating a wrongful death cause of action for deaths occurring on the high seas—an area generally beyond the reach of state law.[12] *See Moragne,* 398 U.S. at 393, 90 S.Ct. at 1784. The legislative history of DOHSA indicates that Congress intended DOHSA to work in conjunction with state laws by "leaving unimpaired the rights under State statutes as to deaths on waters within the territorial jurisdiction of the States." S.Rep. No. 216, 66th Cong., 1st Sess., 3, 4 (1919); H.R.Rep. No. 674, 66th Cong.2d Sess., 3, 4 (1920), *quoted in Moragne,* 398 U.S. at 397, 90 S.Ct. at 1786. This Court's interpretation of DOHSA thus is consistent with the purpose and policy of DOHSA, and insures complete coverage of deaths occurring on navigable waters—state law supplies the remedy in state territorial waters, and DOHSA supplies the remedy outside state territorial waters. To construe DOHSA as applying to deaths occurring more than one marine league offshore without regard to state territorial boundaries would impair the rights under state statutes, and would be completely inconsistent with the long-acknowledged purpose of DOHSA. *See Higginbotham,* 436 U.S. at 621–22, 98 S.Ct. at 2013 (DOHSA limited to accidents occurring on the high seas to "prevent the Act from abrogating, by its own force, the state remedies then available in state waters."); *Moragne,* 398 U.S. at 397, 90 S.Ct. at 1786 (the legislative history of DOHSA "indicates that Congress intended to ensure the continued availability of a remedy, historically provided by the States, for deaths in territorial waters").

The Court acknowledges that there is some language in DOHSA's legislative history that could support the view that DOHSA applies to deaths occurring beyond one league without regard to actual state boundaries. *See* 59 Cong.Rec. 4484 (1920) ("This bill clearly leaves the jurisdiction exclusive in the Federal court outside the 3–mile limit"), *quoted in Tallentire,* 477 U.S. at 225, 106 S.Ct. at 2496. However, the legislative history as a whole reveals a Congressional concern for preserving state remedies in state territorial waters, rather than preserving state remedies within three miles offshore. The seaward territorial boundary of most states is three miles; thus, this usage of "the 3–mile limit" appears to have been no more than a shorthand method of referring to state territorial waters, without understanding that the territorial waters of some states extend beyond three miles. Accordingly, the Court cannot rely on stray references to "the 3–mile limit" to force an interpretation of DOHSA that is inconsistent with its plain language and with its intended purpose.

The Court also acknowledges that other courts considering the question have concluded that DOHSA applies to all deaths occurring more than one league offshore, without regard to the territorial boundaries of the adjacent state. *See Brons v. Beech Aircraft Corp.,* 627 F.Supp. 230, 231–32 (S.D.Fla.1985) (while Florida's Constitution extends its seaward boundary three leagues from the shoreline into the Gulf of Mexico, waters beyond a marine league are not territorial waters of Florida for purposes of precluding a DOHSA action); *Chute v. United States,* 466 F.Supp. 61, 65 (D.Mass.1978) (where death occurred beyond one marine league but within waters claimed by Massachusetts, death did not occur in state territorial waters for purposes of determining applicability of DOHSA); *Hooker v. Raytheon Co.,* 212 F.Supp. 687, 694 (S.D.Cal.1962) (where death occurred beyond one marine league offshore but within Santa Barbara channel claimed by the state, death did not occur within state territorial waters

---

**12.** Of course, there were isolated instances where state law was applied to accidents occurring in the high seas. *E.g., The Hamilton,* 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264 (1907).

Nonetheless, state laws were rarely adequate to fill the gap left by *The Harrisburg. See Moragne,* 398 U.S. at 393 n. 10, 90 S.Ct. at 1784 n. 10.

for DOHSA purposes).[13] The Court does not find these cases persuasive.

The decisions in *Chute* and *Hooker* are based primarily on the fact that the boundaries claimed by the states exceeded the territorial waters claimed by the United States. *Chute*, 466 F.Supp. at 65; *Hooker*, 212 F.Supp. at 693–94. *Brons* offered no additional analysis of the issue, and reached its decision by simply relying on *Chute* and *Hooker*, and stating that the plaintiff "has not formulated a persuasive reason to abandon existing precedent." 627 F.Supp. at 232.

Historically, the territorial waters of the United States extended three nautical miles. *See, e.g., Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 441 n. 8, 109 S.Ct. 683, 692 n. 8, 102 L.Ed.2d 818 (1989); *United States v. California*, 332 U.S. 19, 32–34, 67 S.Ct. 1658, 1665–66, 91 L.Ed. 1889 (1947). However, in 1988, President Reagan extended the United States territorial sea to twelve nautical miles. Proclamation No. 5928, 54 Fed.Reg. 777 (1988). Thus, the concern reflected in *Chute, Hooker,* and *Brons* about recognizing a state boundary that exceeded the national boundary is not present in this case. Because the Texas three league boundary is well within the United States twelve mile boundary, giving effect to that boundary does not create a problem in the areas of national or international affairs.[14]

Accordingly, the Court concludes that, by virtue of section 767, DOHSA applies to deaths occurring offshore of Texas only if the death occurred more than three marine leagues from the Texas coast. Because there is evidence demonstrating that the crash that killed the Plaintiffs' decedent occurred within the three league boundary, as well as evidence demonstrating the crash occurred outside the three league boundary, there is a question of fact that must be resolved before a determination of the applicable law can be made. The Defendants' Motion for Partial Summary Judgment, therefore, is hereby **DENIED.**

### IV.

The Court recognizes that its ruling in this case adds complexity to the already too complex and confusing body of law governing admiralty wrongful death and survival actions. Ruling that DOHSA applies to all deaths occurring more than one league offshore regardless of state territorial boundaries would have made for a rule of easy application, and would have contributed to the highly praised yet elusive goal of achieving uniformity in maritime law. However, maritime personal injury law has always been driven by facts, with vastly different results flowing from only slight differences in facts. *See* Robert Force, *The Curse of Miles v. Apex Marine Corp.: The Mischief of Seeking "Uniformity" and "Legislative Intent" in Maritime Personal Injury Cases*, 55 La. L.Rev. 745, 765–66 (1995). Because absolute uniformity can never be achieved in maritime law, a course of action should not be taken simply for the sake of uniformity without carefully analyzing the history of and purposes guiding the laws with which uniformity is sought. Any benefit that may result from achieving uniformity among laws designed to

13. *But see Hernandez v. Freeport McMoran, Inc.*, No. 92–1326 (1992 WL 161171) (E.D.La. June 23, 1992) (concluding that DOHSA did not apply to death occurring more than one league offshore because the location of the death was within Louisiana territorial waters as defined in *United States v. Louisiana*, 452 U.S. 726, 101 S.Ct. 2605, 69 L.Ed.2d 368 (1981)).

14. The statute declaring the seaward boundary of Texas provides that the boundary is "subject only to the right of the United States to regulate foreign and interstate commerce under Article I, Section 8 of the United States Constitution, and the power of the United States over admiralty and maritime jurisdiction under Article III, Section 2 of the United States Constitution." Tex Nat. Resources Code § 11.012(b). The Court does not believe these limitations have any impact on the Court's decision. First, the limitations are wholly unnecessary, given that they merely state the power the federal government has, by virtue of the supremacy clause, over all state waters. Second, while Congress clearly has the power to legislate in state waters, the Court has concluded that DOHSA reveals a Congressional intent to leave the regulation of accidents involving non-seamen in state waters to the states. Thus, this Court's recognition that Texas wrongful death and survival statutes apply to deaths occurring within three leagues of the Texas shore in no way conflicts with federal power over interstate commerce and maritime matters.

address completely different problems or to benefit completely different classes of persons may well be outweighed by the damage caused by the loss of rights or remedies sacrificed at the altar of uniformity.

Moreover, the lack of uniformity in this case springs primarily from the Supreme Court's decision in *Yamaha*. Once it is established that state wrongful death and survival statutes are applicable in state territorial waters, this Court's recognition that the territorial boundaries of Texas extend farther than the territorial boundaries of most other coastal states adds little to the mix. Where an accident occurs is largely fortuitous; vessel operators do not hold their collective breaths until they cross the magical three mile boundary and then suddenly change their behavior upon crossing into the high seas. Thus, it should make little difference to the operation of commercial shipping that a few more accidents may now be deemed to occur in state waters and be governed by state law.

**IT IS SO ORDERED.**