# Third District Court of Appeal

## State of Florida

Opinion filed June 6, 2018.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D17-316
Lower Tribunal No. 16-323-P

_____

**Laurie Kipp, etc.,**
Appellant,

vs.

**Amy Slate's Amoray Dive Center, Inc., et al.,**
Appellees.

An Appeal from the Circuit Court for Monroe County, Luis M. Garcia, Judge.

Brais & Associates, P.A., and Keith S. Brais and Richard D. Rusak; Keller & Bolz, LLP, and John W. Keller, III, and Sheyla Mesa, for appellant.

The Chartwell Law Offices, LLP, and Krista Fowler Acuña and Marcus G. Mahfood, for appellees.

Before EMAS, LOGUE, and LINDSEY, JJ.

LOGUE, J.

Laurie Kipp, as personal representative of the Estate of her husband, Steven Kipp, seeks review of the trial court's order dismissing her complaint against Amy Slate's Amoray Dive Center, Inc. and Edward Hall. In pertinent part, the complaint was brought under Florida's law of negligence and the Death on the High Seas Act (DOHSA), 46 U.S.C. §§ 30301-30308 (2015). The trial court determined that this case can only be brought under DOHSA in federal court. We reverse.

Background

According to the complaint, on November 12, 2015, Steven Kipp was working as crew on a scuba dive charter boat owned and operated by Amy Slate's Amoray Dive Center, Inc. and captained by Edward Hall. That evening, the vessel took customers for a night dive on the Benwood wreck. When adverse currents swept some surfacing divers as far as a half mile away, Kipp snorkeled out to shepherd them back to the boat. While doing so, Kipp suffered a heart attack and died. Kipp's widow filed suit on behalf of herself and their children against the dive center and the captain of the vessel.

The complaint contained six counts: (1) Jones Act negligence against the dive center;[1] (2) General maritime unseaworthiness against the dive center as owner of the vessel; (3) State tort negligence against the dive center; (4) DOHSA

---

[1] 46 U.S.C. § 30104 (2015).

2

claim against the dive center; (5) State tort negligence against the captain; and (6) DOHSA claim against the captain.

The dive center and the captain each filed motions to dismiss contending the cause of action was controlled by DOHSA because the death occurred more than three nautical miles from shore. In response, Ms. Kipp argued that DOHSA does not apply because, as the complaint alleged, the death took place within Florida's territorial waters that extend beyond three nautical miles to the western edge of the Gulf Stream. The trial court took judicial notice that the wreck was located approximately 6.5 nautical miles from shore and granted the motions to dismiss because the death occurred more than three nautical miles from the coast and therefore was subject to DOHSA.[2] In dismissing the complaint, the trial court held DOHSA provides an exclusive remedy available only in federal court and therefore "this Court is precluded from reaching the merits of the remaining issues." Ms. Kipp timely appealed.

Analysis

The central issue in this appeal concerns whether DOHSA applies to a death that occurred more than three nautical miles from the coast of Florida, but still

---

[2] A nautical mile is approximately 1.151 miles. Three nautical miles make a "marine league." The statutes and cases discussed in this opinion often use the term "marine leagues." For ease of reference, we have converted measurements in marine leagues to nautical miles which is indicated in brackets, for example, "[three nautical miles]."

3

within Florida's territorial waters. On this point, this case presents an issue of pure statutory interpretation. On one hand, DOHSA expressly applies to deaths on the high seas more than three nautical miles from the shore of the United States. 46 U.S.C. § 30302. On the other hand, DOHSA by its plain terms, "does not affect the law of a State regulating the right to recover for death," and it "does not apply" to "waters within the territorial limits of a State." 46 U.S.C. § 30308(a)-(b).

For most coastal states, these two provisions do not conflict because their territorial waters do not extend beyond three nautical miles. But Florida's Atlantic boundary extends to three miles from the coast or to the shoreward edge of the Gulf Stream, whichever is greater. Art. II, § 1, Fla. Const. (1968).[3] And the

[3] Under the Florida Constitution, the state's boundaries, in pertinent part, proceed:

> thence in a straight line to the head of the St. Marys River; thence down the middle of said river to the Atlantic Ocean; thence due east to the edge of the Gulf Stream or a distance of three geographic miles whichever is the greater distance; thence in a southerly direction along the edge of the Gulf Stream or along a line three geographic miles from the Atlantic coastline and three leagues distant from the Gulf of Mexico coastline, whichever is greater, to and through the Straits of Florida and westerly, including the Florida reefs, to a point due south of and three leagues from the southernmost point of the Marquesas Keys; thence westerly along a straight line to a point due south of and three leagues from Loggerhead Key, the westernmost of the Dry Tortugas Islands; thence westerly, northerly and easterly along the arc of a curve three leagues distant from Loggerhead Key to a point due north of Loggerhead Key; thence northeast along a straight line to a point three leagues from the coastline of Florida; thence northerly and westerly three leagues distant from the coastline to a point west of the mouth of the Perdido River three leagues from the coastline as measured on a line bearing south 0°01′00″ west from the point of

4

shoreward edge of the Gulf Stream often runs seven or more nautical miles from the coast.[4]

Congress ratified Florida's unusual boundaries, including its territorial waters, when it approved Florida's 1868 Constitution and re-admitted Florida to full representation in the House and Senate in the aftermath of the Civil War. See Act of June 25, 1868, Ch. 70, 40th Congress 2d Sess. (1868), 15 Stat. 73; Art. I, Fla. Const. (1868); United States v. States of Louisiana, Texas, Mississippi, Alabama & Florida, 363 U.S. 1, 125 (1960), supplemented sub nom. United States v. Louisiana, 382 U.S. 288 (1965) ("Congress in 1868 approved [Florida's boundaries including its description of its territorial waters as set forth in Florida's 1868 Constitution], within the meaning of the 1867 Acts.").

---

beginning; thence northerly along said line to the point of beginning. Art. II, § 1, Fla. Const. (1968).

[4] See, e.g., Benson v. Norwegian Cruise Line Ltd., 859 So. 2d 1213, 1215 (Fla. 3d DCA 2003).

[5] For example, the reach of the Florida Constitution's prohibition on the use of certain gill nets extends less than Florida's constitutional territorial waters. Art. X, § 16(c)(5), Fla. Const. (limiting the prohibition to "nearshore and inshore Florida waters" defined as "all Florida waters inside a line three miles seaward of the coastline along the Gulf of Mexico and inside a line one mile seaward of the coastline along the Atlantic Ocean."). Cf. § 376.031, Fla. Stat. (2018) (Florida prohibits polluting discharges from ships anywhere in its territorial limits and even prohibits such discharges outside its territorial limits if they affect "lands and waters within the territorial limits of the state.").

Of course, the fact that Florida's Atlantic boundaries extend to the Gulf Stream does not necessarily mean that Florida's tort laws extend to the Gulf Stream. Florida itself may decide that particular Florida laws apply to less than the full extent of its territorial waters.[5] Regarding torts, however, the reach of Florida law extends out to the full limits of Florida's constitutional boundaries, including its territorial waters, as we previously held in Benson v. Norwegian Cruise Line Ltd., 859 So. 2d 1213, 1215 (Fla. 3d DCA 2003).

Benson involved an incident of medical malpractice that occurred 11 nautical miles from shore but landward of the Gulf Stream. At issue was whether the doctor, who was not a Florida resident, had committed a tort in Florida and therefore came within Florida's Long Arm Statute for purposes of personal jurisdiction. This court held he did. First, the court quoted from Article II, section 1 that, at the point where the St. Mary's River enters the Atlantic Ocean, Florida's boundary proceeds "due east to the edge of the Gulf Stream or a distance of three geographic miles whichever is the greater distance." Id. at 1215. It then noted that, according to the expert evidence, "[t]he ship was located 11.7 nautical miles east of Florida's coastline. The ship had not yet reached the edge of the Gulf Stream, which was 14 nautical miles east of the relevant portion of Florida's coastline on the day in question." Id.

6

The court concluded, "based on the boundary as stated in the Florida Constitution, the claimed incident of medical malpractice occurred within Florida's territorial boundaries." Id.; see also Fla. Dep't of Revenue v. New Sea Escape Cruises, Ltd., 894 So. 2d 954, 962 (Fla. 2005) (citing Benson with approval for the proposition that "medical malpractice occurring on a cruise ship 11.7 miles off of Florida's coast occurred within Florida's territorial waters based on expert evidence establishing that the Gulf Stream was 14 nautical miles east of the relevant portion of Florida's coastline on the day in question").

Even if Florida tort law extends to the Gulf Stream boundary, Congress has the authority to curtail the reach of Florida law or limit rights granted by Federal law to less than the full extent of Florida's territorial waters as established in the Florida Constitution. For example, the Submerged Lands Act granted Florida the rights to the resources in the submerged lands off Florida's coast extending nine nautical miles from the Gulf coast and three geographic miles from the Atlantic coast. United States v. Fla., 425 U.S. 791 (1976) (interpreting 43 U.S.C. § 1301, et. seq.). The Submerged Lands Act recognized "the seaward boundaries of a State or its boundaries in the Gulf of Mexico or any of the Great Lakes as they existed at the time such State became a member of the Union, or as heretofore approved by the Congress." 43 U.S.C. § 1301(b). However, it further provided that "in no event shall the term 'boundaries' . . . be interpreted as extending from the coast line more

7

than three geographical miles into the Atlantic Ocean or the Pacific Ocean, or more than three marine leagues into the Gulf of Mexico." Id.

With this background in mind, we consider whether Congress, by the plain language employed in the DOHSA text, intended to limit Florida's wrongful death remedy to less than Florida's entire territory. As mentioned above, Congress provided that DOHSA applies to deaths on the high seas more than three nautical miles from the shore of the United States:

> When the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas beyond 3 nautical miles from the shore of the United States, the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible. The action shall be for the exclusive benefit of the decedent's spouse, parent, child, or dependent relative.

46 U.S.C. § 30302 (emphasis added). At the same time, however, Congress clearly expressed its intent that DOHSA does not preempt state wrongful death statutes and DOHSA does not apply to the territorial waters of a State. In this regard, DOHSA also provides:

> (a) State law.--This chapter does not affect the law of a State regulating the right to recover for death.
>
> (b) Internal waters.--This chapter does not apply to the Great Lakes or waters within the territorial limits of a State.

46 U.S.C. § 30308 (emphasis added).

We reconcile this language by reading the provisions of section 30302 as establishing a general rule and section 30308 as providing specific exceptions. In

other words, we construe these two sections, read in pari materia, as providing that DOHSA applies to deaths more than three nautical miles from shore except "within the territorial limits of a State" where it otherwise would "affect the law of a State regulating the right to recover for death."

This reading best comports with the plain meaning of the text. It gives proper effect to the three-nautical miles provision by recognizing that limit governs except where its application would affect a State's wrongful death remedy or cause DOHSA to apply within the territory of a state.

The contrary reading -- that the three-mile limit applies regardless of whether it eliminates a state wrongful death remedy within the territory of a state -- would render the express provisions of section 30308 meaningless because there would be no circumstances where the provisions of section 30308 would apply. Following fundamental canons of construction, we reject an interpretation that would render not simply words, but an essential section of the statute superfluous. Duncan v. Walker, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute.") (citation and quotation omitted).

Moreover, a departure from this fundamental canon of construction here would render meaningless a provision of DOHSA, section 30308, which has always been understood as being central to DOHSA. The Supreme Court has noted that "the reason Congress confined DOHSA to the high seas was to prevent the Act

9

from abrogating, by its own force, the state remedies then available in state waters." Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 621-22 (1978). The legislative history of DOHSA, the United States Supreme Court has held, "indicates that Congress intended to ensure the continued availability of a remedy, historically provided by the States, for deaths in territorial waters." Moragne v. States Marine Lines, Inc., 398 U.S. 375, 397 (1970) (superseded by statute, 33 U.S.C.A. §§ 901-950, as recognized in Garris v. Norfolk Shipbuilding & Drydock Corp., 210 F.3d 209, 226 n.4 (4th Cir. 2000)).[6]

We note there is no language in DOHSA similar to the language in the Submerged Lands Act, discussed earlier, providing "in no event shall the term 'boundaries' . . . be interpreted as extending from the coast line more than three geographical miles into the Atlantic Ocean or the Pacific Ocean, or more than three marine leagues into the Gulf of Mexico." 43 U.S.C. §1301(b). If Congress had intended to place a similar limitation in DOHSA, it would have used similar limiting language. We find the absence in DOHSA of such "in no event" language telling.

---

[6] In Moragne, the Court noted that the prior "opinion in The Harrisburg [v. Rickards, 119 U.S. 199, 213 (1886)] acknowledged that the result reached had little justification except in primitive English legal history – a history far removed from the American law of remedies for maritime deaths." Moragne, 398 U.S. at 379. The Court went on to "overrule The Harrisburg, [and] hold that an action does lie under general maritime law for death caused by violation of maritime duties." Id. at 409.

Indeed, Congress enacted DOHSA to provide a wrongful death remedy, albeit a limited one, where no remedy previously existed: "The core purpose of DOHSA was to provide a remedy where one did not exist before, not to oust either a Moragne-type remedy or state law remedies." In re Air Crash Off Long Island, New York, on July 17, 1996, 209 F.3d 200, 215 (2d Cir. 2000). To accomplish this purpose, Congress did not need to preempt state wrongful death remedies within state territorial waters. Thus, not only does the text expressly disavow any intent to "affect the law of a State regulating the right to recover for death," but no Congressional purpose would be served by implying such preemption.

Finally, this reading is also in accordance with the only case fully analyzing this issue, Blome v. Aerospatiale Helicopter Corp., 924 F. Supp. 805, 813 (S.D. Texas 1996), aff'd without opinion, 114 F. 3d 1184 (5th Cir. 1997). In Blome, a U.S. Coast Guard inspector was killed when the helicopter transporting him crashed into the Gulf of Mexico. His family filed a wrongful death action against the operators and manufacturers of the helicopter. The death occurred seven miles offshore. But Texas's territorial waters, similar to those along Florida's Gulf Coast, extend nine nautical miles from shore. Id. at 814.

Noting that before DOHSA was enacted by Congress in 1920 federal maritime law provided no cause of action for wrongful death,[7] the Blome court

---

[7] See The Harrisburg, 119 U.S. at 213 (holding no cause of action for wrongful death "will lie in the courts of the United States under general maritime law").

11

reasoned that DOHSA was enacted "to fill the gap . . . by creating a wrongful death cause of action for deaths occurring on the high seas – an area generally beyond the reach of state law." Blome, 924 F. Supp. at 813. Thus, "Congress intended DOHSA to work in conjunction with state laws by 'leaving unimpaired the rights under State statutes as to deaths on waters within the territorial jurisdiction of the States.'" Id. (quoting S. Rep. No. 216, 66th Cong., 1st Sess., 3, 4 (1919); H.R.Rep. No. 674, 66th Cong., 2d Sess., 3, 4 (1920)).

The Blome court therefore held that "the only natural interpretation of DOHSA is that the statute applies to deaths occurring more than one marine league [more than three nautical miles] from shore unless the death occurred in state territorial waters." Id. at 812. DOHSA did not apply because the death, which occurred more than three nautical miles from the coast, nevertheless occurred within the territorial waters of Texas. Id.

We are not persuaded by the cases cited by the Dive Center and Captain Hall because in those cases the states had no recognized claim to waters outside the three nautical miles where DOHSA's jurisdiction begins. In Chute v. United States, 466 F. Supp. 61 (D. Mass. 1978), the court held that Massachusetts had no

---

Courts nevertheless began applying state wrongful death and survival statues to deaths occurring in state territorial waters in the wake of The Harrisburg. See Western Fuel Co. v. Garcia, 257 U.S. 233 (1921); The Tungus v. Skovgaard, 358 U.S. 588 (1959).

12

legitimate claim to waters outside three nautical miles and therefore a death beyond that limit was covered by DOHSA. Similarly, the court in Hooker v. Raytheon Co., 212 F. Supp. 687 (S.D. Cal. 1962) held that California had no legitimate claim to waters outside three nautical miles and therefore a death past that limit was covered by DOHSA. In contrast, here Florida's claim to waters outside three nautical miles has been recognized by Congress and the United States Supreme Court.

We recognize that the Southern District of Florida has held "that the waters of the Gulf of Mexico beyond a marine league [beyond three nautical miles] from the Florida shoreline are not territorial waters of Florida for the purpose of precluding a DOHSA action," and that "[t]his result best effectuates congression[al] intent." Brons v. Beech Aircraft Corporation, 627 F. Supp. 230, 232 (S.D. Fla. 1985). But as the Blome court noted, "Brons offered no additional analysis of the issue, and reached its decision by simply relying on Chute and Hooker, and stating that the plaintiff 'has not formulated a persuasive reason to abandon existing precedent.'" Blome, 924 F. Supp. at 814 (quoting Brons, 627 F. Supp. at 232). Nor does Brons address the Congressional Acts and Supreme Court cases that recognize Florida's boundaries as established in Florida's 1868 Constitution. Given this absence of independent analysis, and the fact it follows

Hooker and Chute, both of which we find distinguishable and inapplicable, we likewise are unpersuaded by Brons.

The Dive Center and Captain Hall also cite Helman v. Alcoa Global Fasteners, Inc., 637 F.3d 986 (9th Cir. 2011) in support of their argument. Helman involved a helicopter crash that occurred approximately 9.5 nautical miles off the coast of California. The principal issue in Helman was whether Presidential Proclamation No. 5928, 54 Fed. Reg. 777 (Dec. 27, 1988), which extended the territorial waters of the United States from three to twelve nautical miles from shore, altered the applicability of DOHSA. However, the interplay between the three-nautical-mile limitation in DOHSA and any state remedies in state territorial waters was not at issue in that case and was not addressed by the court in the opinion. The extension of the U.S. territorial waters by Presidential Proclamation would impact the overall territoriality of the United States, but would not necessarily implicate any changes to a state's dominion over its congressionally approved territorial waters.

Finally, the defendants' reliance on Ray v. Fifth Transoceanic Shipping Co., Ltd., 529 So. 2d. 1181 (Fla. 2d DCA 1988) is equally unavailing. The Dive Center and Captain Hall note this case held that "[s]tate wrongful death statutes are preempted by DOHSA." Id. at 1183. But Ray concerned a passenger who boarded a cruise ship in Puerto Rico but was killed while touring a city on the island. The

14

passenger went on the tour after having been assured on the ship that the tours on the island were safe. Id. at 1182. The issue was whether DOHSA could apply to a death that occurred on land. The Second District found that DOHSA applied because the allegedly negligent assurance of safety occurred on the ship outside the territorial waters of the United States. Id. at 1183. The case contains no discussion of the issue before this court, namely, whether DOHSA applies to an accidental death more than three nautical miles from the coast of a state but still within the territorial waters of the state.

Based upon the foregoing, we reverse the trial court's ruling that the subject case is governed by DOHSA because that determination depends on whether Mr. Kipp's death occurred in Florida's territorial waters. In turn, that determination depends on whether Mr. Kipp's death occurred on the landward side of the edge of the Gulf Stream, a factual issue that cannot be resolved on a motion to dismiss given the allegations in the complaint.

After deciding that this case was governed by DOHSA, the trial court found the exclusive forum for DOHSA claims was federal court. In doing so, the trial court followed the binding precedent of this court where we held "Congress has spoken directly to the question of the authority of state courts to entertain DOHSA claims and has decided that the sole forum for DOHSA actions lies in admiralty." Bailey v. Carnival Cruise Lines, Inc., 448 So. 2d 1090, 1094 (Fla. 3d DCA 1984)

(Schwartz, J., dissenting). In so ruling, this court recognized that a split of authority existed on this issue. Indeed, finding the contrary cases more persuasive, Judge Alan Schwartz dissented: "I would hold that Florida courts have jurisdiction over actions arising under the Death on the High Seas Act." Id.

As has occurred many times in the past, Judge Schwartz's dissenting position was subsequently approved. In Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207 (1986), the United States Supreme Court resolved the conflicting precedents and held that state courts have concurrent jurisdiction to entertain DOHSA claims, thereby superseding our prior decision in Bailey. The Fourth District in Hughes v. Unitech Aircraft Serv., Inc., 662 So. 2d 999, 1000 (Fla. 4th DCA 1995) recognized that Bailey had been superseded by Tallentire, and concluded "that Florida state courts do have jurisdiction over DOHSA claims." Id. at 1001. We agree with the Fourth District.

Reversed and remanded for further proceedings consistent with this opinion.

EMAS, J., concurs.

LINDSEY, J., concurring.

I concur in result only and would reverse solely on the grounds that the trial court failed to confine itself to the four corners of the complaint when it dismissed the complaint and made factual findings as to the number of miles the Benwood is located from the coast of Florida based on a government website that does not so indicate.

17

In Count I, brought under the Jones Act, 46 U.S.C. § 30104, Ms. Kipp alleged that "Steven Kipp died within the Florida state territorial waters as defined by Article II, section 1(a) of the Florida Constitution." Alternatively, in Counts IV and VI, brought under the Death on the High Seas Act, 46 U.S.C. § 30302 ("DOHSA"), Ms. Kipp alleged that Mr. Kipp's "death occurred on the High Seas."

Amy Slate's Amoray Dive Center requested the trial court to take judicial notice that the Benwood "is geographically located at GPS: 25-03.144 N, 80-19.930 W *or 6.5 nautical miles (7.5 miles) off the coast of Key Largo, Florida*" and attached as an exhibit the National Oceanic and Atmospheric Administration's ("NOAA") website documenting the location of the Benwood based on the GPS coordinates. (Emphasis added). The trial court granted the request and found that Mr. Kipp's "death occurred 7.5 miles off the coast of Florida." The trial court further concluded that his "passing occurred outside the three miles adjacent to the coastline within which a cause of action sounding in DOHSA may not be brought for actions occurring therein, that Congress defined the term high seas for purposes of DOHSA, that DOHSA is applicable, and that DOHSA pre-empts [sic] other avenues of relief[.]"

A trial court's review of a motion to dismiss is limited to the four corners of the complaint. Minor v. Brunetti, 43 So. 3d 178, 179 (Fla 3d DCA 2010). The purpose of a motion to dismiss is to test legal sufficiency, not determine factual

18

issues. Id. (citations omitted). All allegations contained within the complaint "must be taken as true and any reasonable inferences drawn from the complaint must be construed in favor of the non-moving party." Id. (citation omitted). Further, section 90.202(11), Florida Statutes (2016) permits courts to take judicial notice of "[f]acts that are not subject to dispute because they are generally known within the territorial jurisdiction of the court" and section 90.202(12), Florida Statutes (2016) permits courts to take judicial notice of "[f]acts that are not subject to dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned."

Ms. Kipp alleged in Count I that Mr. Kipp died within the Florida state territorial waters and alternatively, in Counts IV and VI, that his death occurred on the high seas. There are no allegations within the four corners of the complaint alleging the distance, in miles – nautical or otherwise – between the Benwood and the coast of Florida. The trial court's finding that the location of the Benwood is 7.5 miles from the coast of Key Largo, Florida, or that Mr. Kipp's passing occurred more than three miles from the coastline, was error. The exhibit from the NOAA website does not state the distance from the coast to the Benwood wreck nor otherwise indicate that it is 6.5 nautical miles, 7.5 miles, or more than 3 miles off the coast of Key Largo, Florida. Because the trial court's dismissal of the complaint is premised on factual findings that are neither set forth in the complaint

19

nor appear on the face of the exhibit from the NOAA website, of which the court took judicial notice, I would reverse.