# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

-------------------------------
No. 99-40681
-------------------------------


NEVILLE MOTTS; ET AL
          Plaintiffs,

DANNA MOTTS, Individually and as Personal
Representative of the Estate of Neville Motts,
          Plaintiff-Appellee,

v.

M/V GREEN WAVE, Its Engine, Tackle, In Rem; ET AL,
          Defendants,

CENTRAL GULF LINES, INC.; LMS
SHIPMANAGEMENT, INC.,
also known as Lash Marine Services,
          Defendants-Appellants.


---------------------------------------------------
Appeal from the United States District Court
for the Southern District of Texas
---------------------------------------------------

May 9, 2000

Before DAVIS, CYNTHIA HOLCOMB HALL,[*] and SMITH, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

---

[*]Circuit Judge of the Ninth Circuit, sitting by designation.

An unfortunate sea accident and the tragic events that followed it require us to consider the relationship between general federal admiralty jurisdiction and the Death on the High Seas Act ("DOHSA").  We hold that DOHSA applies where the decedent is injured on the high seas, even if a party's negligence is entirely land-based and begins subsequent to that injury.

I.

The decedent, Neville Motts, joined the M/V Green Wave as Chief Engineer on January 10, 1998, for its voyage to McMurdo Station in Antarctica.  The Green Wave's mission was to resupply the American scientific research center in McMurdo.  The Green Wave arrived at McMurdo but encountered engine difficulties on its return voyage.  Specifically, the No. 2 piston broke, causing the entire engine to fail.

The ship's Captain, Peter Stalkus, ordered Motts to repair the engine.  Motts, assisted by the second and third assistant engineers, attempted to repair the No. 2 piston.  The three engineers removed the 3000-pound cylinder head and laid it on its headstand.  Before they had a chance to secure the cylinder head to the headstand, the ship experienced an unforeseeable, dramatic roll.  This roll caused the cylinder

2

head to slide off its headstand, knocking Motts down and pinning him against a platform rail. Motts suffered a badly crushed pelvis and hip as a result. Motts's treating physician, who has performed over 2,000 hip surgeries, testified that Motts's was one of the most severe injuries he had ever treated.

Motts was examined by Captain Stalkus and the Chief Mate, in preparation for a telephone consultation with a physician at George Washington University Hospital ("GWU"). GWU's Maritime Medical Access Unit provides medical advice to ships at sea. GWU's doctor initially diagnosed a soft-tissue injury, but recommended that Motts be x-rayed as soon as possible, so that a more serious injury could be ruled out. Although Motts told Captain Stalkus that he had a history of vascular problems and cardiovascular surgeries, Stalkus did not relay this information to GWU's personnel.

Appellant Central Gulf Lines, Inc. ("CGL") owns and operates the Green Wave. Appellant LMS Ship Management, Inc. ("LMS") is a Louisiana corporation that serves as the management company for the Green Wave. As part of its contract with CGL, LMS is to ensure adequate and timely medical attention to injured or ill seamen on CGL's vessels. LMS had no employees aboard the Green Wave; LMS's health care officers all work in its New Orleans office. Captain Stalkus informed LMS's officers of the nature of Motts's injuries and of Motts's vascular problems

and history of cardiovascular surgeries.

For the next two days, the Green Wave drifted on the high seas while the crew labored unsuccessfully to repair the vessel's engine. The Green Wave requested and received prompt assistance from the Polar Star, a Coast Guard cutter. The Polar Star began towing the Green Wave toward Christchurch, New Zealand. Over the next two weeks, while the vessel was being towed to port, Motts was bed-ridden in his quarters and mattress on the floor of his ship's office. Over that time his condition did not improve, and he remained in severe pain, causing Captain Stalkus to suspect that Motts had in fact suffered a very serious injury, not a soft-tissue injury. LMS's personnel officer testified that he knew the type of injury Motts had could result in Motts's death. Despite the fact that the Polar Star was equipped with an x-ray machine and staffed by a nurse practitioner, neither Stalkus nor LMS ever requested that Motts be examined or treated on the Polar Star. Indeed, Coast Guard personnel were informed, misleadingly, that the Chief Engineer had suffered only a "minor injury." Nor did LMS ever ask the Coast Guard to use one of the helicopters aboard the Polar Star to evacuate Motts, even though such an evacuation was feasible and safe. Similarly, neither Stalkus nor LMS informed GWU that the Green Wave was being towed by a vessel with such medical facilities. The district court found LMS's conduct to be "utterly negligent and

4

downright inhumane." The district court also found that LMS's failure to have in place any plan for evacuating injured seamen constituted "conscious indifference to the rights and safety or welfare of injured seamen on GCL's vessels, and in particular Neville Motts." Motts v. M/V Green Wave, 50 F. Supp.2d. 634, 642 (S.D. Tex. 1999).

Neville Motts first received appropriate medical attention when the Green Wave arrived in New Zealand on March 1, 1998, two weeks after his injury. LMS provided him with the option of undergoing hip replacement surgery in New Zealand or in Houston. Motts opted to have the operation in Houston. The surgery was performed on March 10, 1998. Ten days later, Motts suffered a fatal heart attack. The district court held that the delays in Motts's receiving treatment proximately caused Motts's death. See id. at 645. Motts's risk of death was at least doubled by the fact that the hip replacement surgery was not performed within 48 hours of the injury. See id. at 644. Specifically, the delays placed Motts at an increased risk of pulmonary embolism and cardiac problems. See id. The three-week interval between the injury and the surgery made the operation ten times more difficult to perform than it would have been had the surgery been done within two days of the injury. See id. at 644-45. The court determined that although Motts's decision not to undergo surgery in New Zealand delayed his operation, the desire to

5

undergo surgery in the United States was normal and reasonable under the circumstances. See id. at 645.

Motts filed suit against CGL and LMS in federal court prior to his death. After his death, Appellee Danna Motts, Neville Motts's widow, was substituted as the plaintiff. Appellee sued CGL under the Jones Act and general maritime law for negligence and unseaworthiness. Appellee sued LMS under Texas state law, or in the alternative, general maritime law. LMS argued that DOHSA provides the exclusive remedy for any suit against it by Appellee. The district court granted in part and denied in part LMS's motion for partial summary judgment in a published opinion, holding DOHSA to be inapplicable. See Motts v. M/V Green Wave, 25 F. Supp.2d. 771 (S.D. Tex. 1998). After a bench trial the court found in Appellee's favor against both Appellants, again in a published opinion. See Motts, 50 F. Supp.2d at 634. Because certain non-pecuniary damages are not available under the Jones Act but are available under Texas state law, such damages were assessed only against LMS. See id. at 646.

II.

We review the district court's determination that DOHSA does not apply de novo. See Bailey v. Carnival Cruise Lines, Inc., 774 F.2d 1577, 1578 (11th Cir.

1985).  We examine the district court's factual determinations that Motts was not contributorily negligent and that CGL failed to render adequate and timely cure for clear error.  See Couch v. Cro-Marine Transp., Inc., 44 F.3d 319, 327 (5th Cir. 1995).

## III.

As a threshold matter, the district court determined that DOHSA does not govern Appellee's claims against LMS.  Because DOHSA does not permit the award of non-pecuniary damages, see 46 U.S.C. § 762, and preempts all wrongful death actions under state law where it applies, see Dooley v. Korean Air Lines Co., 524 U.S. 116, 123 (1998), Appellee can recover punitive and other non-pecuniary damages only if DOHSA is inapplicable.

DOHSA provides, in pertinent part, that "[w]henever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas . . . the personal representative of the decedent may maintain a suit for damages in the district courts of the United States."  46 U.S.C. § 761.  At first glance, the plain text of this statutory provision seems to indicate that DOHSA is implicated only when the wrongful act precipitating death occurs on the high seas.  See Lacey v. L.W.

Wiggins Airways, Inc., 95 F. Supp. 916, 918 (D. Mass. 1951) ("It appears that the phrase 'occurring on the high seas' . . . is adjectival of 'wrongful act, neglect, or default', rather than of 'death'. . . . The statute is taken to mean, therefore, that the wrongful act, neglect or default which caused the death must have occurred on the high seas if a right of action is to exist.").

As subsequent courts have interpreted DOHSA, however, the statute's application is not limited to negligent acts that actually occur on the high seas. The Supreme Court has repeatedly noted that when the death itself occurs on the high seas, DOHSA applies. See Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 218 (1986) ("Here, admiralty jurisdiction is expressly provided under DOHSA because the accidental deaths occurred beyond a marine league from shore."); Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 271 n.20 (1972) ("Of course, under the Death on the High Seas Act, a wrongful-death action arising out of an airplane crash on the high seas beyond a marine league from the shore of a State may clearly be brought in a federal admiralty court.")[1]; Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 620 (1978) (noting that DOHSA creates "a remedy in

_____

[1] Executive Jet was later extended to apply to accidents involving vessels, as well as accidents involving aircraft. See Foremost Ins. Co. v. Richardson, 457 U.S. 668, 674 (1982).

8

admiralty for wrongful deaths more than three miles from shore"). In those cases, unlike in the instant case, the decedent perished at the site of the accident. But, as Offshore Logistics and several Fifth Circuit decisions have made clear, DOHSA also confers jurisdiction if the decedent is on the high seas at the time he suffers his mortal injury. See 477 U.S. at 224 ("The reach of DOHSA's substantive provisions was explicitly limited to actions arising from accidents on the high seas . . . ."); Lewis v. Timco, Inc., 716 F.2d 1425, 1428 (5th Cir. 1983) (observing that "DOHSA applies to accidents occurring beyond a marine league from shore"); Smith v. Pan Air Corp., 684 F.2d 1102, 1111 (5th Cir. 1982) ("[T]he simple fact that Kolb's death occurred as a result of an aircraft crash into the high seas is alone enough to confer jurisdiction under the DOHSA. . . . The place where the negligence or wrongful act occurs is not decisive. The place injury occurs and the function the injured person was performing are more significant.")[2]; In re Dearborn Marine Serv., Inc., 499 F.2d 263, 272 n.17 (5th Cir. 1974) ("DOHSA has been construed to confer admiralty jurisdiction over claims arising out of airplane crashes

---

[2] A recent law review Note concluded that the Smith court's conclusion "that admiralty jurisdiction could exist under DOHSA without a maritime nexus" is consistent with DOHSA's framework and purpose. See Russell J. Smith, Note, Congress Giveth and the Fifth Circuit Taketh Away: Post Executive Jet Viability of the Admiralty Extension Act, 6 U.S.F. Mar. L.J. 609, 618 (1994).

on the high seas though the negligence alleged to have caused the crash occurred on land."); see also Bergen v. F/V St. Patrick, 816 F.2d 1345, 1348 (9th Cir. 1987) ("[DOHSA] has been held to refer to the site of an accident on the high seas, not to where death actually occurs or where the wrongful act causing the accident may have originated. It is therefore irrelevant that some of the St. Patrick's crew may have died in territorial waters. It is also irrelevant that decisions contributing to the St. Patrick's unseaworthiness may have occurred onshore or within territorial waters. DOHSA applies to plaintiffs' suits because the St. Patrick's accident causing death occurred on the high seas.") (citations omitted), modified on other grounds, 866 F.2d 318 (9th Cir. 1989). Taken together, these cases support the proposition that LMS's actions here invoke DOHSA jurisdiction even though all of LMS's actions and Motts's death occurred onshore.

Even if the "accident" is defined, not as Motts's initial injury, but as LMS's wrongful acts, DOHSA still applies to the instant action. LMS is accused of a series of omissions that aggravated Motts's injury from treatable to mortal. One series of decisions – LMS's failure to develop a plan for evacuating seamen injured on the high seas – occurred prior to the accident. The others – involving LMS's delays in securing adequate medical treatment for Motts – occurred while Motts was on the high seas. LMS's continuing negligence ceased the moment Motts arrived in New

10

Zealand, where LMS saw to it that Motts received appropriate medical attention.[3]

LMS's negligence in failing to establish an evacuation plan is akin to an airline's inadequate maintenance of an aircraft engine that ultimately causes the aircraft to crash into the sea. Even though the negligence occurred onshore, the fact that the accident occurred on the high seas implicates DOHSA. See In re Dearborn Marine Serv., Inc., 499 F.2d at 272 n.17. LMS's negligent delays in seeking treatment all occurred while Motts was at sea, and transpired because of an at-sea injury to Motts. Under the case law, these facts also suffice to render DOHSA Motts's exclusive remedy against LMS.

The district court did not cite Smith, the Fifth Circuit's primary interpretation of DOHSA jurisdiction. Instead, the district court turned to the wrong body of case law – cases governing admiralty jurisdiction in the absence of a statute such as DOHSA.[4] But it should be clear that there is only partial overlap between the

---

[3] Motts's decision to seek care in the United States may have been reasonable, as the district court found, but LMS cannot be held responsible if it was that final delay in undergoing surgery that proximately caused Motts's death.

[4] In Brown v. Eurocopter, S.A., 38 F. Supp.2d 515 (S.D. Tex. 1999), Judge Kent identified two competing schools of thought on when DOHSA applies. Either "DOHSA supplies admiralty jurisdiction independent of any doctrinal test for the existence of such jurisdiction," id. at 517, or courts are to apply "traditional maritime [jurisdiction] analysis to determine whether DOHSA applies," id. at 518. But Brown cites Smith v. Pan Air as its authority for the latter view, and a careful reading of Smith demonstrates that it never embraces such a view. Rather, Smith

11

universe of cases in which DOHSA confers federal admiralty jurisdiction and the universe of cases in which general maritime law confers federal admiralty jurisdiction. See, e.g., Offshore Logistics, 477 U.S. at 218-19 ("Here, admiralty jurisdiction is expressly provided under DOHSA because the accidental deaths occurred beyond a marine league from shore. Even without this statutory provision, admiralty jurisdiction is appropriately invoked here under traditional principles because the accident occurred on the high seas and in furtherance of an activity bearing a significant relationship to a traditional maritime activity."). Instructively, the Court in Executive Jet, 409 U.S. at 268, noted that the federal courts are to apply the two-pronged test for admiralty jurisdiction "in the absence of legislation to the contrary." DOHSA qualifies as "legislation to the contrary." So even if the two-pronged test for admiralty jurisdiction has not been met, DOHSA confers federal admiralty jurisdiction where the injury or accident resulting in death occurred while the decedent was at sea.[5]

notes that courts have interpreted DOHSA to apply to some cases outside of 42 U.S.C. § 761's plain meaning, in addition to those cases clearly covered by § 761's text. In any event, the Supreme Court cases cited above certainly establish that the first school of thought identified in Brown is the correct view and that the second school of thought identified in Brown is incorrect.

[5] While we hold that DOHSA does expand federal admiralty jurisdiction, we note that DOHSA does not appear to confer federal question jurisdiction on the courts. See Pain v. United Techs. Corp., 637 F.2d 775, 781 (D.C. Cir. 1980); Filho

In order to determine whether DOHSA governs, the district court applied Executive Jet's "locality-plus" test, which initially calls for a determination of where the wrongful act occurred. Motts, 25 F. Supp.2d at 774-75. The district court held that LMS's negligence "is not of a type that the Court can pinpoint to a specific location on the high seas." Id. at 775. The district court identified LMS's injury to Motts as the moment "LMS's negligence aggravated the decedent's first injury from merely painful and immobilizing to mortal." Id. It then held that this worsening may have occurred at any moment between the first injury at sea and decedent's death in Houston. Because making such a "metaphysical" determination was "beyond a court's abilities" the district court fixed the moment of fatal worsening at the time of decedent's death. Id. & n.3. Since Motts died onshore, the district court held that Motts's injury did not implicate DOHSA under the locality prong of Executive Jet. But by the time decedent arrived in Houston, LMS's negligent behavior had ceased. Any LMS negligence must have occurred while Motts was still at sea or in New Zealand's territorial waters, where DOHSA would still apply. See Sanchez v. Loffland Bros. Co., 626 F.2d 1228, 1230 & n.4. (5th Cir. Unit A

v. Pozos Int'l Drilling Servs., Inc., 682 F. Supp. 94, 100 (S.D. Tex. 1987); William C. Brown, III, Problems Arising from the Intersection of Traditional Maritime Law and Aviation Death and Personal Injury Liability, 68 Tul. L. Rev. 577, 580 (1994).

13

1980). The district court's determination that Motts's actionable injury occurred onshore was therefore clearly erroneous.[6]

This Circuit's precedents look to the location of the accident in determining whether DOHSA applies. True, none of the DOHSA cases cited above involve post-accident negligence occurring while the victim was still at sea.[7] That said, as long as the decedent is still on the high seas at the time the negligence begins, DOHSA must apply to post-accident negligence.[8] Indeed, such a focus on the decedent's location at the time of the injury, rather than the tortfeasor's location, avoids many of the "metaphysical uncertainties" that so troubled the district court.

---

[6] We do not agree with the district court's "moment of consummation" approach. As we explain herein, the district court's attention should have been drawn to Motts's location when he was injured by the piston, not the moment at which Motts's injury went from being bad to inevitably fatal.

[7] One district court case concludes that whether the negligence occurs pre- or post-accident is not relevant. See Moyer v. Klosters Rederi, 645 F. Supp. 620, 628 (S.D. Fla. 1986) (Plaintiff's allegations that Defendants acted negligently both before and after the snorkeling expedition do not defeat admiralty jurisdiction. The key operative fact, disputed by none of the parties, is that decedent's illness commenced . . . while he was on the high seas, as defined by DOHSA . . . ."). Unfortunately, Moyer proceeds to make the same mistake made by the district court here, concluding that Executive Jet's two-pronged test must also be satisfied in order for DOHSA jurisdiction to exist.

[8] DOSHA is not implicated by post-accident negligence that begins after the victim leaves the high seas. For example, had Motts died as the result of medical malpractice in Houston, Appellee's state-law suit against his doctor would not have been preempted by DOHSA.

14

In light of our conclusion that DOHSA applies to the instant suit, the district court's award of non-pecuniary damages to Appellee was erroneous.[9]

IV.

Appellants argue that the district court clearly erred by failing to find that Motts was contributorily negligent. Appellants' argument centers on Motts's alleged use of insufficient assistants in moving the cylinder head and his failure to secure the cylinder head prior to the ship's roll.

Appellants submit that Captain Stalkus ordered Motts to use deck department personnel to assist him with the heavy lifting that the repair would require. While Stalkus indeed testified to that effect, the district court obviously did not find his testimony credible, based on the inconsistencies contained therein. Such a credibility finding was certainly within the district court's discretion. And it does sound implausible that Motts, a very experienced and skilled seaman, would have violated a direct order so brazenly. The district court was therefore free to disregard

---

[9] Given our conclusion that Appellee is not entitled to punitive damages as a matter of law, three issues on appeal raised by Appellants (concerning the propriety of the district court's decision to hold CGL jointly and severally liable for punitive damages with LMS, the availability of prejudgment interest on the punitive damages award, and whether the district court's decision to award punitive damages was clearly erroneous) become moot.

15

Stalkus's testimony and conclude that Motts did not violate a direct order to utilize additional crew members in the repair. That is precisely what the district court did when it chose not to believe Stalkus's story, and found that the "Captain also instructed Mr. Motts to utilize deck department personnel to assist with the rigging and securing of the head, piston and liner, if required." 50 F. Supp.2d at 638 (emphasis added). The district court's factual determination was not clearly erroneous.

Although Appellants presented some credible evidence suggesting that Motts was negligent by failing to secure the cylinder head, Appellee's evidence suggesting that Motts was not negligent is strong. The district court credited the statements of the two surviving witnesses to the accident, who both stated that the vessel rolled "before the head could be lashed down," suggesting that Motts was planning to fasten the cylinder head at the time of the accident. Id. at 638. The court found the ship's roll unforeseeable, given the weather conditions at the time. See id. The court reasonably inferred that Motts assumed the head cylinder's sheer weight would prevent it from sliding in the event of a roll. See id. And the court credited the expert testimony of two witnesses, both of whom described Motts's seamanship practices in glowing terms. See id. at 642. Given this evidence, it was certainly reasonable for the district court to determine that Motts was not contributorily

16

negligent. The district court made a difficult judgment call, but one that was well within the fact finder's discretion.

V.

Appellant CGL takes issue with the district court's finding that it failed to render timely, adequate cure. Appellant pins its hopes on the district court's determination that it was reasonable for CGL to rely on the medical advice dispensed by GWU. GWU did not recommend that Motts be evacuated from the Green Wave. On the other hand, the district court found that Captain Stalkus, a CGL agent, knowingly withheld highly pertinent information from GWU, including information about Motts's prior cardiovascular difficulties and surgeries, the immediate proximity of a helicopter-equipped coast guard vessel, and the availability of an x-ray machine and nurse practitioner on the Polar Star. The district court also found that Stalkus disregarded GWU's advice that Motts be x-rayed as soon as possible.

CGL's argument on this issue does not come close to warranting a reversal. Given the current state of medical technology, the diagnosis of a doctor who is assessing a patient's condition from a location thousands of miles away depends on the accuracy of the information conveyed to that doctor. When a ship's master

17

withholds known, material, medical information from a diagnosing physician, it is no defense to say that the master reasonably relied on the physician's instructions.

## VI.

For the foregoing reasons, we AFFIRM the judgment of the district court with respect to CGL, and REVERSE the district court's award of non-pecuniary damages assessed against LMS.[10]  We REMAND for an entry of judgment consistent with this opinion.

---

[10] Specifically, we vacate the awards of $75,000 for Appellee's past mental anguish; $25,000 for past loss of society; $200,000 for future mental anguish; $75,000 for future loss of society; and $250,000 in punitive damages.  We affirm the awards of $225,000 for physical pain and mental anguish sustained by Neville Motts; $50,686 for the past loss of care, maintenance, and support; $400,000 for the future loss of care, maintenance, and support; and the award of prejudgment interest on the remaining damages.  See 50 F. Supp.2d at 646-47.